STATE of Tennessee, Appellee,

v.

Terrance B. PULLIAM, Appellant.

Court of Criminal Appeals of Tennessee,
at Jackson.

Oct. 22, 1996.

Permission to Appeal Denied by
Supreme Court, May 12, 1997.

April R. Ferguson (on Appeal), Robert M. Brannon, Jr. (at Trial), Memphis, for Appellant.

Charles W. Burson, Attorney General and Reporter, Robin L. Harris, Assistant Attorney General, Criminal Justice Division, Nashville, John W. Pierotti, District Attorney General, Eddie Peterson, Asst. District Attorney General, Memphis, for Appellee.

## OPINION

HAYES, Judge.

The appellant, Terrance B. Pulliam, was convicted by a Shelby County jury of premeditated first degree murder. The trial court sentenced the appellant to life imprisonment. On appeal, the appellant raises the following three issues:

(1) whether the trial court erroneously admitted expert testimony;

(2) whether the evidence is sufficient to support his conviction; and

(3) whether the prosecutor engaged in misconduct during closing argument.

Following a review of the record, we affirm the judgment of the trial court.

## FACTUAL BACKGROUND

Testimony at trial revealed that the victim, Lee Franklin, was approximately twenty years old at the time of his death. He lived in Memphis with his mother, Beverly Franklin, and his younger brother, Marcus Franklin. He worked as a cashier and bagged groceries at a local grocery store and unloaded trucks at Roadway Truck Line, while studying to be an aircraft mechanic at Spartan School of Aeronautics and Millington School of Aeronautics. He had previously attended one year of college in Oklahoma.

The conflict between the appellant and Lee Franklin began in July, 1992, when the appellant shot Franklin's brother. Following this incident, according to the State's witnesses, Franklin and the appellant occasionally engaged in verbal altercations. On October 2, 1993, at approximately 12:45 a.m., Franklin, his cousin Cameron Aldridge, and a friend Robert Barr, went to Club Memphis to socialize and dance. None of the group drank while at Club Memphis, as the Club does not serve alcohol to those under twenty-one. The group left the Club at approximately 3:20 a.m. to return home. As they entered the parking lot, they encountered another acquaintance, Christopher Body. Body informed Lee Franklin that he had seen the appellant in the parking lot. At this point, Aldridge got into Body's car. Body then circled the parking lot and backed his car into a space adjacent to Franklin's Ford Bronco. The Ford Bronco was parked facing the sidewalk and the street. Franklin and Barr walked toward the Bronco. Barr noticed that the front passenger window of the Bronco had been broken while the group had been inside the Club. As he and Franklin approached the Bronco, the appellant's car hit Franklin at an approximate speed of 30 to 40 miles per hour. The appellant then jumped from his car and fired his gun approximately three times in Franklin's direction. Barr testified that the gun was "[s]ome kind of like a black automatic—like a little automatic .25—anywhere from .25–.32 automatic; something like that." Franklin attempted to run, but fell to the grass in front of his Bronco and rolled onto the sidewalk. The appellant drove out of the parking lot and turned onto the street in front of the Bronco. At this point, Franklin indicated to Robert Barr that he had been shot. Robert Barr testified, "So when [Franklin] said 'I been shot' that's when [the appellant] stops in the middle of the street, comes, like, over to the passenger's side [of his vehicle], aims out, shoots again." Cameron Aldridge testified that, as the appellant shot at Franklin a second time, he said, "If I didn't get you this time, I got you this time, boy." According to the State's witnesses, neither Franklin nor his companions were armed.

Dr. O.C. Smith, an assistant medical examiner for Shelby County, testified that, prior to his death, Lee Franklin suffered several injuries to the head, including abrasions and a bruise on the left forehead and abrasions on the left cheekbone and jaw. He died as a result of a gunshot wound to the chest. The bullet struck Franklin behind his left arm, penetrated the skin, fractured the left sixth rib, entered the left lung, proceeded through the heart, bruised the right lung, and broke the cartilage portion of his right fifth rib. Dr. Smith testified that the results of both the blood alcohol test and a blood drug screen were negative.

Dr. Smith retrieved a bullet from Franklin's body. He testified that the bullet appeared to have been fired from either a .38 caliber revolver or a .357 magnum revolver. The bullet was a hollow-point bullet. Smith additionally stated that hollow point bullets are manufactured for the purpose of creating more tissue damage along the wound track. However, he opined that the bullet is not, in reality, a more effective bullet.

Officer Jimmy L. Daniels testified that, on the morning of the shooting, he participated in the collection of evidence at the crime scene. The police recovered various items, including two 380 caliber live rounds and a 9 mm casing. The police did not confiscate any guns at the crime scene.

Montreal Reed, a good friend of the appellant, testified on behalf of the appellant. He testified that, in September, 1993, he witnessed an attempt by Franklin to run over the appellant. On October 2, 1993, the day before the appellant shot Lee Franklin, Reed observed Franklin engage in a high-speed

chase of the appellant, while shooting at the appellant. According to Reed, his girlfriend, Shantay Briggs, also witnessed both incidents. Reed conceded on cross-examination that nobody called the police following either incident. Shantay Briggs testified that, on October 2, 1993, Franklin, armed with a gun, initiated a car chase of the appellant. She did not mention the September incident.

Carl Berry, the appellant's stepfather, testified that, in 1992, the appellant was in a "group home," serving a sentence for the shooting of Marcus Franklin. The appellant was allowed to return home on weekends and holidays. Berry recounted that, on Thanksgiving, 1992, the appellant was again at home. He went to the store immediately prior to Thanksgiving dinner. Following the appellant's return, Lee Franklin and two members of his family arrived. One of the men informed Berry that he was looking for the appellant. This man further stated that he was "tired" of the appellant and intended to kill him. Berry overheard Franklin tell the man at the door to shoot Berry. Berry shut the door and called the police. Berry further testified that, on Easter day, 1993, or in the early morning hours of the following day, Lee Franklin followed the appellant home and broke the glass in Berry's storm door. Finally, Berry testified that he was certain that his stepson had not kept any weapons in the house, because he had checked the appellant's belongings daily.

Terry Dickens, Montreal Reed's brother, also testified on behalf of the appellant. He had known the appellant for four or five years. On the night of October 2, 1993, he and the appellant visited some female acquaintances. As they were returning home, they encountered another acquaintance who asked for a ride to Club Memphis. At Club Memphis, Dickens and the appellant lingered in the parking lot. When they began to leave, Lee Franklin stepped in front of the appellant's car. According to Dickens, Franklin told a friend to obtain his gun. Dickens then ducked his head down. The appellant pulled a gun from underneath his seat. Dickens heard one shot, and he and the appellant drove away. On cross-examination, Dickens testified that the appellant

had informed him earlier that evening that he was carrying a .38 caliber revolver. According to Dickens, the appellant indicated that he needed the gun for protection. Dickens conceded that he had not talked to any official, including the defense attorney, concerning this case until fourteen months following the incident. He explained that he did not feel the need to report his involvement in the shooting, as the appellant had already surrendered to the police. The appellant called him frequently while in jail. Finally, Dickens admitted that he was convicted in 1990, in the Shelby County Juvenile Court, of theft of property. He explained that a friend had picked him up in a stolen car. He knew that the car was stolen, but wanted "to have a little fun." He was also arrested in 1992 and 1993, for gambling. Those charges were "adjusted non-judicially." In 1988, he was arrested for shoplifting and referred to the Youth Center of Memphis. He now works as a security guard for Nike.

The appellant testified that his feud with the Franklins began in July, 1992, when he had a fight with a friend of Marcus Franklin. He subsequently received a phone call from Lee Franklin, who was in Oklahoma. Franklin informed the appellant that "he was going to come down [t]here and get [the appellant]." Later that week, the appellant was visiting Sabrina Bowen, Lee Franklin's girlfriend, and her brother, Tony Bowen. Lee Franklin, Marcus Franklin, Cameron Aldridge, and some other men arrived at Sabrina Bowen's home. According to the appellant, Marcus Franklin got out of his car and began "talking crazy." When the group started to move toward him, the appellant opened fire. He shot Marcus Franklin. "I just kept pulling the trigger. When the bullets was gone I was still pulling the trigger." He then threw the gun at the group. At this point, Lee Franklin struck the appellant with his fist. The case was adjudicated in the juvenile court system.

The appellant confirmed the incidents described by his stepfather and Montreal Reed. With respect to the shooting of Lee Franklin, the appellant testified that he did not know that Lee Franklin would be at Club Memphis

in the early morning hours of October 3, 1993. The appellant asserted that Lee Franklin stepped in front of his car as he was leaving. The appellant immediately applied the brakes, but hit Franklin. Franklin then instructed Robert Barr to obtain his gun. The appellant shot at Franklin one time in order to scare him and left. He did not intend to actually shoot Franklin or kill him. He did not realize that Lee Franklin was dead until he watched the news later that morning.

On cross-examination, the appellant testified that he obtained his gun on October 2, 1993, following Lee Franklin's high-speed pursuit of the appellant. He bought the gun for $40 from an acquaintance named "Dan." He bought a .38 caliber revolver with six rounds of ammunition. He had shot Marcus Franklin with a different .38 caliber revolver. He had bought that pistol a few days following the call from Lee Franklin in Oklahoma. He had bought that gun for $30 from a man on the street named "Bobo." He testified that both Dan and Bobo are "crack-heads." After he shot Lee Franklin, the appellant drove to his cousin's home, and instructed his cousin to dispose of the gun.

In rebuttal, Marcus Franklin testified that, on the occasion on which he was shot, he was attempting to ask the appellant about an earlier incident in which the appellant had allegedly thrown rocks at Marcus Franklin's truck. He testified that the appellant shot him as he was trying to get out of his truck. He had only put one foot on the pavement before he was shot. He was shot in the back of his left shoulder. Marcus also testified that his relatives visited the appellant's home on Thanksgiving, 1992, because the appellant and Tony Bowen had earlier driven by the Franklin house. Marcus was in the driveway and observed the appellant point a shiny object in his direction.

Ed Aldridge, Lee and Marcus Franklin's uncle, testified. He was 44 years old. He is a car salesman for the Acura of Memphis Company. At the time of the trial, he had worked with Acura for 6 months. Previously, he had worked as a car salesman at Covington Pike Honda for thirteen years. On Thanksgiving, 1992, he was at Beverly Franklin's home. He, his brother-in-law Richard Ellis, and one other person went to the appellant's home. He wanted to resolve the conflict between his nephews and the appellant, as he was concerned that someone might be hurt. Richard Ellis knocked on the door. Mr. Aldridge remained in the street. When the appellant's stepfather indicated that he did not want to speak to them, they left. Aldridge conceded that he could not hear what was said at the door. Richard Ellis was unable to testify as he had died of natural causes prior to the trial.

At the conclusion of the trial, the jury found the appellant guilty of first degree murder.

## ANALYSIS

### 1. Expert Testimony

■ First, the appellant contends that the trial court erred by permitting Dr. Smith to testify concerning the purpose of a bullet designed with a hollow-point, because Dr. Smith was not qualified as a ballistics expert. Tenn.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

An expert's qualification in one area will not necessarily preclude testimony concerning a closely related subject. *See Sotka v. State,* 503 S.W.2d 212, 226 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1972). Moreover, the determination of the qualifications of an expert witness and the relevancy and competency of expert testimony are matters generally entrusted to the sound discretion of the trial court. *State v. Anderson,* 880 S.W.2d 720, 728 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1994). This court will not overturn the trial court's decision absent a clear abuse of discretion. *Id.* (citing *State v. Williams,* 657 S.W.2d 405, 411 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984)). Any error must be prejudicial. *State v. Tizard,* 897 S.W.2d 732, 748 (Tenn.Crim.App.1994).

■ At trial, Dr. Smith testified that he has served as an assistant medical examiner for Shelby County since 1978. Additionally, he is the Deputy Chief Medical Examiner for Western Tennessee and an assistant professor of pathology within the division of forensic pathology at University of Tennessee Memphis. He testified that he has published numerous articles in medical journals, primarily concerning ballistics. The court declared the doctor an expert in forensic pathology. During the State's direct examination of the doctor, the prosecutor asked the doctor about the position of the victim's body at the time he was shot. Defense counsel objected on the basis that the doctor was not qualified as an expert in ballistics. In response to the trial court's inquiry into his knowledge of ballistics, Dr. Smith stated:

Well, I've conducted a large number of autopsies on people that die by penetrating missile wounds—or bullet wounds. I've conducted research into the wounding effectiveness of various ammunitions. I believe I have somewhere in the neighborhood of about thirty publications either having been published or in preparation for publishing, some of which deal with the effects of different types of bullets: hollow-point bullets, dumb-dumb bullets made from military ammunition, as well as the effects of bullets upon the human body in incapacitation, as well as the determining the direction of fire by a bullet through the body based upon the fracture pattern that the bullet will leave in the bone.

The trial court overruled the objection.

The prosecutor continued to examine the witness. However, when he asked Dr. Smith why a hollow-point bullet, such as the one recovered from the victim's body, is designed with a cavity or depression in its tip, defense counsel again objected on the basis that the information was irrelevant and prejudicial and the witness was not qualified to provide the information. The court then conducted a jury-out hearing.

Dr. Smith testified that he had written an article for the Federal Bureau of Investigation National Academy on the wounding effectiveness of ammunition used by federal law enforcement agencies. According to Dr. Smith, his studies addressed the purpose of a hollow-point design and the effectiveness of the design. He concluded that the hollow-point bullet was an engineering failure. In writing the article, Dr. Smith participated on a panel which included the director of the wound ballistics laboratory for the United States Army, representatives from Battel Industries, a company that creates munitions designs for the United States military, and various law enforcement officers. He further testified:

The opinion of the original intent behind the hollow-point bullet design is based upon analysis of the law enforcement and assistance administration grant and report of 1974, in which large numbers of hollow-point ammunition were tested and the design criteria set for that type of ammunition were the emphasis placed upon the approximate or the initial wound volume that a hollow-point bullet would create as opposed to a full-metal jacket or non-expanding bullet would create.... [T]he only known purpose for a hollow-point bullet based upon all of my education, all of my research and training and experience, has been directed towards producing a bullet [to] disrupt or expand at the nose.

Additionally, Dr. Smith testified that he has read advertising and "reloading" literature describing the purpose of a hollow-point bullet. The court again overruled the appellant's objection, finding that the doctor was qualified to testify about the purpose of a hollow-point bullet, that this information was probative of the appellant's intent, and that the probative value of the information outweighed any prejudice. Having reviewed the record, we conclude that the trial court properly admitted Dr. Smith's testimony. This issue is without merit.

## 2. Sufficiency of the Evidence

■ The appellant challenges the sufficiency of the evidence to sustain his conviction for first degree murder. Specifically, the appellant contends that the evidence adduced at trial does not support findings of premeditation and deliberation. A jury conviction removes the presumption of innocence with which a defendant is initially cloaked

and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). The defendant must establish that the evidence presented at trial was so deficient that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); Tenn.R.App.P. 13(e).

Moreover, an appellate court may neither reweigh nor reevaluate the evidence when determining its sufficiency. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). "A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." *Williams*, 657 S.W.2d at 410. The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *Id.* *See also State v. Harris*, 839 S.W.2d 54, 75 (Tenn.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

■■■ The State may prove a criminal offense by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899–900 (Tenn. 1987). *See also State v. Brown*, 836 S.W.2d 530, 541 (Tenn.1992) ("the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cognent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). *See also State v. Gregory*, 862 S.W.2d 574, 577 (Tenn.Crim.

App.1993). As in the case of direct evidence, the weight to be given circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citation omitted). In this case, both direct and circumstantial evidence was available for the jury's consideration.

■■■ The relevant statute defines first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39–13–202(a)(1) (1991). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39–11–106(a)(18) (1991). Additionally, premeditation necessitates "a previously formed design or intent to kill," *State v. West*, 844 S.W.2d 144, 147 (Tenn.1992), and "the exercise of reflection and judgment," Tenn.Code Ann. § 39–13–201(b)(2) (1991). Deliberation requires a "cool purpose" and the absence of "passion or provocation." Tenn. Code Ann. § 39–13–201(b)(1) and Sentencing Commission Comments.[1]

■■■ Once a homicide has been proven, it is presumed to be a second degree murder, and the State has the burden of establishing premeditation and deliberation. *Brown*, 836 S.W.2d at 543. Again, although the jury may not engage in speculation, *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1995), the jury may infer premeditation and deliberation from the circumstances surrounding the killing. *Gentry*, 881 S.W.2d at 3. Our supreme court has delineated several circumstances which may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill the victim, and the making of preparations before the

---

1. With respect to deliberation, we note that, in *State v. Gentry*, 881 S.W.2d 1, 5 (Tenn.Crim.App. 1993), *perm. to appeal denied*, (Tenn.1994), this court stated, "The [mere] presence of agitation

*. . ., in our view, does not necessarily mean that the murder could not have occurred with the requisite degree of deliberation."*

killing for the purpose of concealing the crime. *Brown,* 836 S.W.2d at 541–542. This court has also recently noted several factors from which the jury may infer the two elements, including planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *Bordis,* 905 S.W.2d at 222 (*quoting* 2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* § 7.7 (1986)).

 In the instant case, the appellant purchased the murder weapon the afternoon prior to the killing, following an altercation with the victim. Several witnesses observed the appellant's vehicle run into Lee Franklin and further observed the appellant shoot several times in Franklin's direction. The State's witnesses testified that Franklin was unarmed. Following the shooting, the appellant began to drive away, but stopped his car beside the fallen victim in order to shoot at him two more times. One witness testified that he overheard the appellant say, "I got you this time, boy." Dr. Smith testified that he retrieved a hollow-point bullet from the victim's body, a bullet designed to inflict particularly great damage to human tissue and so advertised to the public. Finally, although the appellant claims that the killing was inadvertent and precipitated by his fear of the victim, the credibility of a witness is determined by the jury and reflected in its verdict. We conclude that the record overwhelmingly supports findings of premeditation and deliberation. This contention is meritless.

### 3. Prosecutorial Misconduct

Finally, the appellant contends that the prosecutor engaged in misconduct when he made the following remarks, during rebuttal closing argument, quoting the mayor of Memphis:

> The streets of our city and inner-city neighborhoods are no longer safe for decent people. We are killing each other in alarming numbers. There exists a criminal element which has no regard for human life, has no moral conduct or behavior, and which knows no boundaries. If we act now we can turn this madness around. We must recognize that we are all in this

> together. The streets of our city are no longer safe for decent people.
>
> Decent people like Lee [Franklin].
>
> We are killing each other in alarming numbers.
>
> There exists a criminal element in our city such as the defendant, such as [Bobo, the individual who sold the appellant the murder weapon] ...—that has no regard for human life—has no moral conduct or behavior—and which knows no boundaries.
>
> If we, speaking to the city as a whole—I speak to the jury in particular—act now we can turn this madness—which it surely is—around.
>
> The killing of unarmed, innocent, decent people like Lee—We can turn it around.
>
> And we must surely recognize that we are all in this together, because if we do not, we're all subject to jeopardy in our lives.

Defense counsel objected. The trial court overruled the objection, stating to the jury, "Well, ladies and gentlemen, I allow each lawyer wide latitude within the limits of the law, to argue their theory of the case ... I will allow the prosecutor to continue his argument, keeping in mind that it is just that. It is argument." The prosecutor continued his closing argument, remarking, "I have never seen the mayor in this building. He's never been in any murder trial that I've conducted or I've come in as a spectator on. But he knows what is happening out there." Defense counsel again objected. The State made the following response:

> I'm not attempting to impassion [the jury] and I would direct my response—the fact that [defense counsel] said that they should use their common sense. And so I'm using this statement by him, and this analogy in front of them to bring up something that he brought up: Using their common sense.

Defense counsel's objection was sustained.

 In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict. *State v. Sutton,* 562 S.W.2d 820, 823 (Tenn.1978). *See also Harrington v. State,*

215 Tenn. 338, 385 S.W.2d 758, 759 (1965) (the test to be applied by the appellate courts in reviewing instances of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant").

■■■■ With respect to the impropriety of the prosecutor's statements, our supreme court has observed that "argument of counsel is a valuable privilege that should not be unduly restricted. Our courts seek to give great latitude to counsel in expressing their views of the case to the jury." *Smith v. State,* 527 S.W.2d 737, 739 (Tenn.1975). *See also State v. Bigbee,* 885 S.W.2d 797, 809 (Tenn.1994). The trial judge has wide discretion in controlling the argument of counsel. *Smith,* 527 S.W.2d at 739. Generally, on appeal, this court will not interfere with the exercise of that discretion in the absence of abuse thereof. *Id.* Nevertheless, "[c]losing argument 'must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried.' " *Sutton,* 562 S.W.2d at 823 (citation omitted). In other words, the bounds of proper argument are established by the facts in evidence, the character of the trial, and the conduct of opposing counsel. *State v. Seay,* 945 S.W.2d 755 (Tenn.Crim. App.1996) (citing *State v. Byerley,* 658 S.W.2d 134 (Tenn.Crim.App.1983)).

■■■ Arguments concerning deterrence and appeals to the jury to act as the community conscience are not necessarily impermissible. *See Seay,* 945 S.W.2d 755; *State v. Dalton,* No. 01C01–9408–CR–00291, 1995 WL 408230 (Tenn.Crim.App. at Nashville, July 11, 1995); *State v. Weems,* No. 89–276–III, 1990 WL 45697 (Tenn.Crim.App. at Nashville, April 19, 1990). Nevertheless, the Sixth Circuit Court of Appeals has observed that "prosecutors should exercise extreme caution when making any statement referring to the community interests of the jurors." *United States v. Solivan,* 937 F.2d

1146, 1154 (6th Cir.1991). The court of appeals further stated:

> The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers. The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice.

*Id.* at 1152 (citing *Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943)). Accordingly, the court disapproved of appeals by prosecutors to convict defendants in order to further the highly publicized "War on Drugs." *Id.* at 1153.

■■■■ The prosecutor's statements in the instant case exceeded mere allusions to society's need to convict guilty people or a general appeal to the jury's sense of community, especially in light of the growing national concern about escalating urban violence.[2] Nevertheless, in evaluating the impact of prosecutorial misconduct, we must consider the following factors:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case.

(2) the curative measures undertaken by the court and the prosecution.

(3) the intent of the prosecutor in making the statement.

(4) the cumulative effect of the improper conduct and any other errors in the record.

(5) the relative strength or weakness of the case.

*Judge v. State,* 539 S.W.2d 340, 344 (Tenn. Crim.App.1976). Our Supreme Court ap-

---

2. However, we decline to equate the social-political context of the prosecutor's remarks in the instant case with the "War on Drugs" addressed

in *Solivan,* 937 F.2d at 1153, or World War II, addressed in *Viereck,* 318 U.S. at 247–248, 63 S.Ct at 566–567.

proved these factors in *State v. Buck*, 670 S.W.2d 600, 609 (Tenn.1984). Considering these factors, particularly the strength of the State's case, we conclude that the prosecutor's argument was not so inflammatory that it affected the verdict to the appellant's detriment.[3]

## CONCLUSION

Accordingly, the trial court's judgment is affirmed.

SMITH, J., and LYNN W. BROWN, Special Judge, concur.

---

**3.** We note that defense counsel failed to request a curative instruction. If a trial judge does not give a curative instruction *sua sponte*, the objecting party must request such an instruction in order to avoid waiving the issue for the purpose of appellate review. *Rhoden v. State*, 816 S.W.2d 56, 63 n. 21 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1991)(citing *State v. Mackey*, 638 S.W.2d 830, 835–836 (Tenn.Crim.App.1982)). *See also* Tenn. R. App P. 36(a) (relief need not be granted "to a party ... who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As noted above, we reject the appellant's position that the prosecutor's remarks were incurably prejudicial.