IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2004

### STATE OF TENNESSEE v. RICKY JOE AWATT

**Direct Appeal from the Circuit Court for Madison County**
**No. 02-170    Roy B. Morgan, Jr., Judge**

_____

**No. W2003-02680-CCA-R3-CD  - Filed October 18, 2004**

_____

The appellant was convicted in the Madison County Circuit Court of the first degree premeditated murder of Junecus Bolden.  The appellant received a sentence of life imprisonment in the Tennessee Department of Correction.  On appeal, the appellant raises issues regarding the admission of certain testimony and the propriety of the State's rebuttal closing argument.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Michael D. Rasnake, Jackson, Tennessee, for the appellant, Ricky Joe Awatt.

Paul G. Summers, Attorney General and Reporter; Helena W. Yarbrough, Assistant District Attorney General; Jerry Woodall, District Attorney General; and Daniel J. Runde and Lawrence R. Nickell, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In the light most favorable to the State, the proof at trial revealed that one or two weeks prior to January 16, 2002, Ernest Ontavious Richard Williamson ("Ernest") had a conversation with the appellant.[1]  During the conversation, Ernest learned that there was "bad blood" brewing between the appellant and the victim, Junecus Bolden.  According to Ernest, the appellant claimed that Bolden had threatened the appellant's brother, Elliot Awatt, and the appellant was "gonna get Bolden back

---

[1] Many of the witnesses in the instant case share a surname.  Accordingly, for clarity, we will be using the first names of the witnesses.  We intend no disrespect to these individuals.

for threatening . . . to kill his brother." The appellant declared that he wanted to kill Bolden, and "[h]e said he could do it himself."

At approximately 8:00 p.m. on January 16, 2002, the appellant accompanied Ernest to the home of Ernest's brother, Anthony Williamson ("Anthony"), because Anthony was going to give Ernest a haircut. While the three men were together, the appellant again talked about "getting" Bolden. Ernest and the appellant left Anthony's house at approximately 10:00 p.m., and Ernest drove the appellant home.

Earlier that day, at approximately 7:00 p.m., Bolden went to the residence of brothers Corey Alexander Moore ("Corey") and Jim Coty Moore ("Coty") for assistance installing a compact disc (CD) player in his car. Bolden was at the Moore residence for several hours. While Bolden was at the Moore residence, the appellant, who was the Moores' cousin and next-door neighbor, arrived. Because of technical difficulties, the men were unable to install the CD player. The appellant pulled Corey aside and told him that Bolden had stolen some guns from him. Accordingly, the appellant wanted to "whoop" Bolden. Corey agreed to help and advised Coty of the plan to beat Bolden.

The appellant informed Bolden that he had a CD player at an abandoned white house in the neighborhood. Therefore, at approximately 10:00 or 10:30 p.m., the Moores, the appellant, and Bolden entered Bolden's car and rode to the location. Once at the house, the Moores and the appellant pretended to look for the CD player in order to lure Bolden out of the car. Eventually, Bolden became frustrated with the search and left the house. Once all four men were outside of the house, Coty announced that it was "taking too long" to begin "teach[ing] [Bolden] a little lesson," so he approached Bolden and began to strike him. Corey and the appellant also hit Bolden. After a few minutes, the Moores determined that they had hit Bolden "enough," and they got back into the car, planning to leave Bolden stranded at the location. However, after hearing five loud shots, the Moores turned to see the appellant standing over Bolden, holding a twelve gauge sawed-off shotgun with fire coming from the barrel. The appellant got into the backseat of the vehicle, and Coty drove them home.

At approximately midnight on January 17, 2002, the appellant arrived at Anthony Williamson's house. He told Anthony that "they had beat somebody up," and Anthony deduced that the appellant was referring to Bolden. Anthony sent the appellant to Ernest's house. Shortly thereafter, Ernest and the appellant returned to Anthony's house, and the appellant again stated that he "did it." The appellant told the Williamsons that "him and his cousins, Coty and Corey, had beat up Mr. Bolden and then [the appellant] shot him." The appellant then insisted that the Williamsons help him move Bolden's body. The Williamsons reluctantly complied.

The appellant, driving Bolden's car, drove the Williamsons to the abandoned white house which was located approximately one-fourth of a mile from the appellant's home. Together, the three men loaded Bolden's body into the trunk of his car, and they tucked a quilt that had been in the trunk around the body. Once the body was in the trunk, the appellant requested that Anthony drive as the appellant did not have a driver's license.

Anthony drove Ernest and the appellant to Ernest's house so that Ernest could get his car. Ernest then drove behind Anthony and the appellant to the south fork of Forked Deer River. Upon arrival at the river, Anthony and the appellant slid Bolden's car off a boat ramp into the river. Thereafter, Ernest drove the trio home.

Later in the afternoon, the appellant returned to the Moore household and asked Corey to help him and his brother Elliot gather the shotgun shells from the scene of the crime. The men gathered the shells and disbursed them on the side of the road as they were driving home.

Bolden's car and body were discovered at approximately 8:15 or 8:30 a.m. on January 17, 2002. Police questioned the appellant, the Moores, and the Williamsons because they were Bolden's friends. Ultimately, the Moores and the Williamsons revealed the story of Bolden's death. The appellant was arrested, and a trial followed.

Based upon the foregoing proof, the jury found the appellant guilty of first degree premeditated murder. The trial court sentenced the appellant to life imprisonment. On appeal, the appellant raises the following issues for our review:

> (1) Whether the Honorable Circuit Court erred in allowing the State's witnesses to view exhibits created in the courtroom by a previous State's witness in violation of Rule 615 of the Tennessee Rules of Evidence; and

> (2) Whether the Honorable Circuit Court committed plain error in allowing the State's attorney to express his personal opinion about the guilt of the appellant and vouch for the credibility of witnesses during closing arguments.

We will address each of these issues in turn.

## II. Analysis

### A. Tennessee Rule of Evidence 615

The appellant argues that the trial court "erred by allowing a Witness, Mr. Anthony Williamson, to view evidence, specifically diagrams with stickers placed by prior State's Witness, Mr. Ernest Williamson, during the subsequent witness' testimony in violation of Rule 615 of the Tennessee Rules of Evidence." Tennessee Rule of Evidence 615 is the rule of sequestration and is "now colloquially referred to as 'The Rule.'" Neil P. Cohen et al., Tennessee Law of Evidence, § 6.15[2] (LEXIS publishing, 4th ed. 2000).

Rule 615 provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . . The court shall order all

persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." Tenn. R. Evid. 615. The purpose of the Rule is to "prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). The Rule may be invoked at any time and is mandatory upon its invocation. See State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). There is no prescribed sanction for violation of the Rule; rather, a trial court retains discretion to impose the appropriate sanction. See State v. Black, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001). Further, "[t]he decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party." Id. at 424-25.

The appellant's complaint centers around the testimony of Ernest and Anthony Williamson. During direct examination, the State asked Ernest to examine a diagram of the abandoned house where Bolden was killed, which diagram was entered into evidence as Exhibit 3. Thereafter, the State requested that Ernest place a sticker on the diagram "where the car was parked when you all pulled up there [to remove the body]." This sticker was labeled "EW 1." Next, Ernest placed a sticker, later labeled "EW 2," to indicate where the car "ultimately end[ed] up" after it was backed into the driveway. Finally, Ernest placed sticker "EW 3" to indicate the location of Bolden's body when he arrived at the abandoned house. The State then presented Exhibit 5, a diagram of the south fork of Forked Deer River. The State asked Ernest to place sticker "EW 4" to depict the location where Ernest "parked while the Bolden vehicle went down towards the river."

After Ernest's testimony, the State called Anthony Williamson to testify. The appellant objected to Anthony viewing the diagram bearing the labeled stickers, arguing that "the rule would declare that we have a clean slate in here so this witness isn't influenced by anything that's already been said or already been put in front of the jury." The trial court reasoned that because the Rule had been requested at the beginning of trial, Anthony "would have no indication that they were put up there as a result of the prior testimony." However, the trial court cautioned that "this witness should not approach so close that he might read any initials on the chart but could still point out at some distance, if asked by the State."

During direct examination of Anthony Williamson, the State brought out Exhibit 3, the diagram of the abandoned house where Bolden was killed. The State asked Anthony if "you can put that sticker up [on Exhibit 3] where you recall the car being stopped, and I'm going to put 'AW1.'" Next, the State gave Anthony another sticker, labeled "AW 2," requesting that he place the sticker on the diagram to indicate where he recalled seeing Bolden's body. Finally, the State displayed Exhibit 5, the diagram of the south fork of Forked Deer River, and asked Anthony to place a sticker indicating where he stopped on the boat ramp prior to sliding Bolden's car into the river.

On appeal, the appellant argues that "[a]llowing Mr. Anthony Williamson to approach and view State's Exhibits Numbers 3 and 5 was tantamount to allowing Mr. Anthony Williamson to hear the testimony of the prior Witness, Mr. Ernest Williamson." Initially, we note that, based upon the trial court's ruling to the appellant's objection, Anthony should not have approached the diagrams to personally place the stickers on the exhibits. Regardless, while Anthony may have viewed stickers

placed on the diagrams by Ernest, there is no indication that the stickers impacted Anthony's testimony. See Black, 75 S.W.3d at 425. Moreover, our examination of the diagrams reveals that Anthony's stickers were not placed in the same location as any of the stickers placed by Ernest. Moreover, the State's questions regarding the diagram were not identical, further lessening any impact upon the appellant. Accordingly, we conclude that even if there were a violation of Rule 615, such violation is harmless. See Anthony, 836 S.W.2d at 605; see also Tenn. R. Crim. P. 52(a).

## B. Closing Arguments

Next, the appellant complains that the State made an improper closing argument by interjecting its "personal opinion as to the appellant's guilt as well as vouching for the credibility of State's witnesses." The appellant concedes that he did not object to any of the foregoing statements during the State's closing argument. Ordinarily, absent such contemporaneous objection, the appellant would have waived this issue. See Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).

However, the appellant contends that

> since the State's case rose or fell upon the credibility of the State's
> witnesses, the [trial court] should have curtailed the prosecutor's
> improper arguments and issued curative instructions to the jury sua
> sponte. The [trial court's] failure to correct the prosecutor and
> provide the jury with curative instructions was "plain error."

Tennessee Rule of Criminal Procedure 52(b) provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to do substantial justice." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c)
> a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and (e)
> consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'" plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). Upon our examination of the record, we decline to address this issue as plain error.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

The appellant specifically complains that the State, during its rebuttal closing argument, stated:

> Poor Ricky Awatt's been sitting in jail. That's where Ricky Awatt deserves to be. That's why you need to find him guilty and send him to the penitentiary under first degree murder.
>
> . . . .
>
> Ladies and gentlemen, that ain't how it works. And okay, you got two veteran detectives who are working this case, and they're gonna get fooled by a couple of snot-nosed teenagers [the Moores and the Williamsons]? Detective Lowery's eyes are gonna widen every time some other little morsel is dropped in his lap? No, that's not how investigations go. That's not how interrogations go. You sit somebody down, you ask them. You press them closely. You get at the inconsistencies. You see where their going from. You question them closely, and through close questioning and good close detective work, how did the finger come to point? To Ricky Awatt because he did it. He did it.

The appellant argues that "[t]he prosecutor was clearly vouching for the credibility of the State's detectives. The prosecutor was also vouching for the credibility of the State's witnesses that were interviewed by the detectives."

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
> (2) the curative measures undertaken by the court and the prosecution[;]
> (3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record [; and]

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Our examination of the alleged error is limited because the record does not include a transcript of the State's initial closing argument or the appellant's closing argument.[2] However, the beginning of the State's rebuttal argument indicates that the prosecutor's comments are in response to contentions made by the appellant in closing argument. Notably, the State elucidated:

> Learned counsel, to make his theory fly, do you know what he's got to do between the lines? Is convince you that these two people and the system is corrupt. . . . [That] [t]hey're our boys. Corey and Coty are our boys, the State's boys, these two fellows' boys who brought this prosecution and who investigated the case.

Accordingly, the State's rebuttal closing argument appears to be a response to the appellant's contention that the State's witnesses were acting to incriminate the appellant in order to prevent their own prosecution. See State v. Timothy Wayne Holland, No. M2001-03129-CCA-R3-CD, 2002 WL 31007428, at *6 (Tenn. Crim. App. at Nashville, Sept. 4, 2002). We can discern no impropriety by the State in its closing.

## III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

NORMA McGEE OGLE, JUDGE

---

[2] The appellant "carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Therefore, generally, "[i]n the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).