IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2005

## STATE OF TENNESSEE v. TERRY BOYD COLLINS

**Appeal from the Criminal Court for Sullivan County**
**No. S45,529    Phyllis H. Miller, Judge**

---

### No. E2004-01677-CCA-R3-CD - Filed October 25, 2005

---

The defendant, Terry Boyd Collins, stands convicted by a Sullivan County jury of arson and presenting a fraudulent insurance claim, for which he received an effective nine-year sentence. Aggrieved of his sentence and convictions, he challenges the sufficiency of the evidence supporting his convictions and claims that prosecutorial comments during closing arguments constitute reversible error, that the trial court's sentencing determination conflicted with the mandates of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and that the trial court erred when denying all forms of alternative sentencing. After a thorough review of the record and applicable law, we affirm the judgments of the lower court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Stephen M. Wallace, District Public Defender; and William A. Kennedy, Assistant Public Defender, for the Appellant, Terry Boyd Collins.

Paul G. Summers, Attorney General & Reporter; Benjamin A. Ball, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and J. Lewis Combs, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The following summarizes the evidence presented at the defendant's trial in the light most favorable to the state, as the jury's guilty verdict accredited this version of the evidence. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant owned a residence in Bloomingdale, Tennessee, where he and his girlfriend, Belinda Gragg, resided. He had unsuccessfully attempted to sell his residence in 2000. On April 30, 2001, at approximately 3:00 p.m., the defendant's neighbors, Faye and Gary Addington, observed the defendant drive up to his residence on his motorcycle, enter his home, exit his home a few minutes later, and drive away

hurriedly. Faye Addington testified that the defendant parked his motorcycle in the spot where his live-in girlfriend usually parked her vehicle. Shortly after they saw the defendant leave his house, the Addingtons heard an alarm sound in the defendant's house, which apparently was a fire alarm monitored by ADT Security Systems. Minutes later they noticed smoke and flames coming from the defendant's home, and Gary Addington phoned 911.

Jessica Runyon was 14-years old and lived with her family in the defendant's neighborhood. At approximately 3:00 on April 30, her school bus dropped her off at the foot of the defendant's street. As she was walking up the defendant's street and was passing his house, she saw the defendant leave his house and drive off hurriedly on his motorcycle. Approximately five to ten minutes after she saw the defendant leave, she heard an alarm sound and saw flames emanating from the defendant's residence.

Shortly thereafter, several fire trucks arrived at the defendant's residence. One of the firefighters testified at trial that the fire was extremely hot and had engulfed the house by the time he arrived, which was seven minutes after he received the emergency response notification. The firefighter also testified that despite the large amounts of water that were doused on the fire, he had difficulty managing the fire; it would recede after being heavily doused with water and then quickly flare up again. He also testified that there was a propane tank near the house that the firefighters were concerned would ignite. When the fire was extinguished, the house had collapsed into the basement.

Daniel Cole was employed by Farmers Insurance Company to manage the $204,000 insurance claim filed by the defendant after his residence and belongings were destroyed by the fire. Mr. Cole had several conversations with the defendant and Ms. Gragg about their reported loss, took a recorded statement from them, and had them create and sign a time line of their activities on April 30, 2001. Additionally, the defendant was deposed and questioned about his activities on April 30, as well. These various statements revealed several inconsistencies in the defendant's reported activities on that date; specifically, in a statement taken under oath he reported that he left his house at 1:30 p.m. after eating lunch there with Ms. Gragg, in his recorded statement he reported he left the house at 2:00, and in his time line, he asserted he left his house at 2:30. Furthermore, in these statements, the defendant maintained that no accelerants were present in his house at the time of the fire.

Gary Young is a cause and origin investigator who was hired by the defendant's insurance company to investigate the cause and origin of the defendant's house fire. As part of his investigation, Mr. Young removed all of the debris from the house, which had collapsed during the fire into the basement. He then examined the burn patterns on the remaining walls and determined that the fire had involved the use of an accelerant. Among other indicators, Mr. Young based his conclusion on the presence of V-shaped burn patterns on the basement walls, the indicators that the fire originated in several places contemporaneously, and the chalky consistency of concrete, which indicated that the fire's temperature was between 2,500 and 3,000 degrees, unlike an unaccelerated house fire whose temperature would average 1,700 degrees.

In the course of his investigation, Mr. Young placed house debris from four different locations in four unused aluminum paint cans and sent them to Dennis Akin to perform a forensic analysis on the debris samples. Mr. Akin's tests revealed that three of the four samples tested positive for the presence of gasoline and that one of those samples also tested positive for the presence of kerosene. When discussing Mr. Akin's test results, Mr. Young opined that the presence of kerosene was significant because it is used to reduce the volatility of gasoline to allow someone to ignite the gasoline without being injured by an instantaneous explosion.

Roy Barrett, James Nuckels, Bobby McGathey, and Bob Waye all testified on behalf of the defendant. Each man was a friend of the defendant, and all of them, including the defendant, frequented a Bloomingdale establishment that was named Nancy's Bar and Grille at the time of the defendant's house fire. Each of these witnesses testified that they were present at Nancy's when the defendant arrived between 2:00 and 2:30 p.m. on April 30, 2001, and that the defendant received a telephone call approximately 30 to 45 minutes thereafter, after which he announced that he had to leave because his house was on fire. Bob Waye also testified that he drove his motorcycle to the defendant's house between 1:30 and 2:00 p.m. on the day in question. Mr. Waye testified that he honked his horn after arriving and waited in the defendant's driveway several minutes but left when the defendant did not respond. Mr. Waye then drove to Nancy's, parked beside the defendant's motorcycle, and went inside and saw the defendant.

Belinda Gragg, the defendant's live-in girlfriend since October 1996, testified that on the day of the house fire, the defendant left their house between 2:30 and 2:40 p.m. and that she left the house to buy some cigarettes at approximately 3:15. When she returned 20 to 30 minutes later, she saw smoke and fire coming out of her kitchen window, and she immediately phoned 911. Ms. Gragg also testified that she kept two oil lamps filled with lamp oil on the mantle and that she stored extra lamp oil under the kitchen sink. She also reported that the defendant kept a weed-eater filled with kerosene on the back porch, that the house had several space heaters in it, that there was an acetylene torch in the basement, and that the fire place had a pilot light which they always kept lit. Ms. Gragg further testified that she was cooking a roast in a crock pot on the day of the house fire.

At the conclusion of the proof, the jury convicted the defendant of arson and presenting a fraudulent insurance claim over $60,000. In a subsequent sentencing hearing, the trial court ordered the defendant to serve a five-year sentence for his Class C felony arson conviction after finding the following enhancement factors applicable to his conviction: factor (2), that the defendant had a previous history of criminal convictions in addition to those necessary to establish his sentencing range; factor (4), that the defendant's crime involved or affected more than one victim; and factor (16), that the defendant abused a position of private trust. *See* Tenn. Code Ann. § 40-35-114(2), (4), (16) (2003). The trial court sentenced the defendant to serve nine years for his Class B felony conviction for presentation of a fraudulent insurance claim over $60,000 after applying enhancement factor (2), that the defendant had a previous history of criminal convictions in addition to those necessary to establish his sentencing range. *See* Tenn. Code Ann. § 40-35-114(2) (2003).

The court subsequently ordered the defendant to serve his convictions concurrently, resulting in an effective nine-year sentence.

*Sufficiency of the Evidence*

In his first three issues on appeal, the defendant challenges the sufficiency of the evidence introduced at trial to support his arson and presentation of a fraudulent insurance claim convictions. Our consideration of that claim is grounded in legal bedrock. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

With these principles in mind, we must determine whether the evidence in this record is sufficient to support the jury's verdict. We begin with the definition of the defendant's conviction offenses, arson and presentation of a fraudulent insurance claim over $60,000. Tennessee Code Annotated section 39-14-301 defines arson as: "knowingly damag[ing] any structure by means of a fire or explosion . . . [w]ith intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose." Tenn. Code Ann. § 39-14-301(a) (2003). Tennessee Code Annotated section 39-14-133 defines presentation of a fraudulent insurance claim as the

> intentional[] present[ation] or caus[ing] to be presented a false or fraudulent claim, or any proof in support of such claim, for the payment of a loss, or other benefits, upon any contract of insurance coverage, or automobile comprehensive or collision insurance, or certificate of such insurance or prepares, makes or subscribes to a false or fraudulent account, certificate, affidavit or proof of loss, or other documents or writing, with intent that the same may be presented or used in support of such claim.

-4-

*Id.* § 39-14-133. This offense is punished in accordance with the dollar values set forth under the theft statutes. *Id.*

Viewed in the light most favorable to the state, the evidence introduced at trial reveals that on April 30, 2001, at approximately 3:00 p.m., the defendant arrived at his house on his motorcycle, entered the house, doused his house with both gasoline and kerosene,[1] lit the accelerant inside his house and outside on his deck, and then left hurriedly on his motorcycle. Three witnesses, Jessica Runyon and Gary and Faye Addington, saw the defendant enter and quickly exit his house at this time. Minutes after the defendant left his house, these witnesses saw smoke emanating from the house and heard a fire alarm sound within the house. Within thirty minutes, the defendant's house was engulfed in flames and had collapsed into the basement. Forensic analysis revealed the presence of both gasoline and kerosene, although the defendant reported to arson investigators that neither accellerant was present in his house at the time of the fire. The presence of two accelerants indicates an intentionally set fire because kerosene is often used by arsonists to lower gasoline's flashpoint to protect the arsonist from being consumed by the fire when he ignites it. Moreover, burn patterns revealed that the fire had two simultaneous points of origin, and the crumbling of concrete in the home revealed that the fire was in excess of 2500 degrees, whereas house fires unaided by an accellerant usually average temperatures of 1700 degrees. Finally, after his house fire, the defendant submitted an insurance claim requesting reimbursement for his $204,000 loss in personal and property damage. Pursuant to his insurance policy, which was introduced as an exhibit at trial, the defendant would only be reimbursed for an "*accidental* direct physical loss" to his insured property. (Emphasis added.) The defendant argues on appeal that the testimony of three defense witnesses affirmatively established his alibi defense. However, the jury's verdict indicates that the jury rejected that defense, and it is within the jury's purview to do so. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (noting that assessment of witness credibility is entrusted to the sound discretion of the trier of fact). We hold that based on this evidence, a jury may have reasonably concluded that the defendant was guilty of both arson and presentation of a fraudulent insurance claim in excess of $60,000.

*Propriety of Prosecutorial Comments During Closing Argument*

The defendant argues that prosecutorial comments during closing argument denigrating defense witnesses by characterizing them as "one convicted felon, a couple of alcoholics, [and] a guy that's a member of the Peacemakers that cheats on his taxes" and as liars were improper, inflammatory, and designed to stigmatize the witnesses. The state counters that the defendant has waived consideration of any issue regarding the prosecutor's characterization of the witnesses other than as liars by only objecting to the prosecutor's comments that the witnesses were lying. The state

---

[1] The evidence suggests that the defendant either doused his house with accellerants sometime before 3:00 p.m. and entered his house at 3:00 to ignite the accellerants or that he doused the house with accelerants when he entered it at 3:00.

further asserts that the prosecutor's characterizations are supported by the witnesses' testimony and were therefore proper. Finally, the state argues that the prosecutor followed the trial court's instruction to substitute the words "not credible" for any reference to lying, and the prosecutor complied and amended his argument accordingly.

It is well established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

When determining the propriety of statements made during closing argument, we must examine the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;] (2) the curative measures undertaken by the court and the prosecution[;] (3) the intent of the prosecutor in making the statement[;] (4) the cumulative effect of the improper conduct and any other errors in the record [; and] (5) the relative strength or weakness of the case.

*Id.* (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In the instant case, the defendant takes issue with the following remarks made by the prosecutor during closing argument:

> [The defendant] brought in, you know, one convicted felon, a couple of alcoholics, a guy that's a member of the Peacemakers that cheats on his taxes, to try to sell you where he was and none of them made sense. They want you to reconcile their testimony, their proof, and yet they want you to think that a fourteen-year-old little girl is lying against this defendant. What sense does that make? Who is going to lie for them, his buddy that runs around with him for 30 years that works for him that's driving his truck that comes in here and puts him at the fire scene 15 minutes before the alarm even goes off? Who is lying in this case[?] His witnesses are lying. This little girl and the Addingtons, Ms. Addington, an elderly –

At this point in the argument, defense counsel objects, and the following colloquy takes place:

[Defense Counsel]:    I mean he shouldn't say they're lying, that's up to the jury to determine.

[Prosecutor]:    That's my argument that they're lying.

[Defense Counsel]:    Not that they're lying.  There's some case –

[Prosecutor]:    Well, they are lying.

[Defense Counsel]:    Well, you can't say – you can't either.

The Court:    Well, say they're not credible.

[Defense Counsel]:    It's up –

The Court:    But you can argue – I think you can say that you're saying that –

[Defense Counsel]:    I don't think he can call them liars, Judge.

The Court:    – his witnesses are not truthful.  Well, just use not credible then.  Okay.

Thereafter, the prosecutor resumed closing arguments and made the following remarks:

All right, let's put it this way.  They're not credible and I think you heard them on the witness stand and the only thing they all agreed to was the type of beer that Doug Barrett drank.  That was the only thing they agreed to.

It is improper for a prosecutor to assert his or her personal opinion as to the credibility of witnesses.  *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) (stating that "[c]ertainly, a lawyer should not assert his or her personal opinion as to the credibility of a witness," and citing the corresponding Tennessee rule of ethics); *Model Code of Prof'l Responsibility* DR 7-106(c)(4) (1980); *see also* 75A Am. Jur. 2d *Trial* § 692 (1991) ("The credibility of a witness is a proper subject for closing argument, but as a matter of professional ethics a lawyer may not state a personal opinion as to the credibility of a witness."); *id.* § 699 ("The general rule . . . is that it is improper for an attorney to vouch for or assert his personal opinion as to the credibility of a witness since it is not proper for counsel to take the position of an unsworn witness as to credibility."). However, "[w]hether a statement qualifies as misconduct often depends upon the specific terminology used." *Thornton*, 10 S.W.3d at 235.  Turning first to the prosecutor's characterization of defense witnesses as consisting of a felon, alcoholics, a former Peacemaker and a tax-evader, we find that these characterizations were supported by the witnesses' testimony.  All of the defendant's alibi witnesses admitted to being long-time friends of the defendant, and all frequented the same bar.  Two witnesses admitted to having drinking problems, one admitted that he had a felony conviction,

and another admitted to his former membership in the Peacemakers and that he received income from his employment with the defendant which he did not report as taxable income.

However, we hold that the prosecutor's unequivocal assertion that the defense witnesses were lying was an improper personal opinion. Moreover, we determine that the trial court's instruction to the prosecutor to reword his argument and characterize the defense witnesses as incredible rather than as liars was a distinction of semantics rather than substance and accordingly did not cure the impropriety. We must next determine whether these improper statements affected the jury's verdict. *See Pulliam*, 950 S.W.2d at 368. Viewing the record as a whole, we hold that the improper comments did not affect the verdict. Although the prosecutor's comments to the court indicate that he intended to affect the jury's credibility determination and the court's ruling did not remedy the error, the strength of the evidence against the defendant was relatively strong, and his alibi defense witness testimony was riddled with inconsistencies. As discussed in our sufficiency review, the forensic evidence against the defendant and state eye-witness testimony were compelling. Moreover, the improper comments constituted a small portion of the state's closing argument, and we discern no other errors in the trial record. Accordingly, we hold that the prosecutor's improper statements on defense witness credibility were harmless.

*Violation of Right to Jury Trial*

The defendant argues that the trial court improperly sentenced him to serve more than the minimum sentence for his presentation of a fraudulent insurance claim conviction[2] in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). Specifically, the defendant contends that the trial court applied two enhancement factors to his sentence[3] and that pursuant to *Blakely* these enhancement factors cannot be applied absent a jury finding of their applicability. However, our Tennessee Supreme Court has recently held that notwithstanding the United States Supreme Court's holding in *Blakely*, the Tennessee sentencing structure does not run afoul of the Sixth Amendment. *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), *petitions for reh'g denied* (Tenn. 2005). Accordingly, this issue does not entitle the defendant to relief.

---

[2] Although the defendant's argument does not specify whether he is attacking the trial court's sentencing determination for his arson conviction, his presentation of a fraudulent insurance claim conviction, or both, the defendant does specify that he received an excessive sentence for his Class B felony, and thus we surmise that he is attacking his Class B presentation of a fraudulent insurance claim sentence as excessive.

[3] The record reflects that the court applied only one enhancement factor to the defendant's presentation of a fraudulent insurance claim sentence, factor (2), that the defendant had a previous history of criminal convictions in addition to those necessary to establish his sentencing range. *See* Tenn. Code Ann. § 40-35-114(2) (2003).

*Denial of Alternative Sentencing*

In his final issue on appeal, the defendant challenges the trial court's denial of all forms of alternative sentencing. The defendant contends that because the trial court erroneously enhanced his sentence to nine years, he became ineligible for consideration for alternative sentencing. However, as discussed above, the defendant's challenge to his enhanced nine-year sentence does not warrant relief, and Class B felons serving nine-year sentences are not eligible for alternative sentencing consideration. *See* Tenn. Code Ann. § 40-35-303(a) (2003) (defendants sentenced to eight years or less are eligible for probationary sentence consideration); *id.* § 40-35-102(6) (providing that a defendant convicted of a Class A or B felony is not presumed to be a favorable candidate for alternative sentencing). Accordingly, the defendant has not demonstrated that he is an appropriate candidate for alternative sentencing. *See State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

*Conclusion*

The defendant has not demonstrated any reversible error committed by the lower court, and we accordingly affirm the judgments below.

_____
JAMES CURWOOD WITT, JR., JUDGE