IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2012

## STATE OF TENNESSEE v. ANTONIO STARKS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-01052      John T. Fowlkes, Jr., Judge**

**No. W2011-02038-CCA-R3-CD  - Filed January 30, 2013**

A Shelby County Criminal Court Jury convicted the appellant, Antonio Starks, of first degree felony murder and aggravated child abuse, and the trial court sentenced him to concurrent sentences of life and fifteen years, respectively.  On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by allowing witnesses to testify about his previous abuse of the victim; (3) the trial court erred by refusing to allow him to question the victim's mother about a prior conviction; (4) the trial court should have granted a mistrial when a police officer testified that the victim had been sexually abused; (5) the trial court should have given a curative instruction when the State made an improper comment during closing arguments; and (6) the trial court should have granted a new trial because the State failed to disclose that the victim's mother received favorable treatment in return for her testimony.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROGER A. PAGE, JJ., joined.

Edwin C. Lenow, Memphis, Tennessee, for the appellant, Antonio Starks.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Carrie Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In January 2010, the Shelby County Grand Jury indicted the appellant for first degree felony murder in the perpetration of aggravated child abuse and aggravated child abuse. The victim was his girlfriend's three-year-old daughter, Amilyia Oliver.

At trial, Linda Henry testified that she was a registered nurse at Delta Medical Center in Memphis. On May 30, 2009, a Saturday, Henry was working as a nurse house supervisor. Shortly after 12:00 p.m., Henry went to the Emergency Department in response to a "code blue," meaning a child's heart had stopped. Henry entered the trauma room and saw a nurse and a doctor working on the victim. She said she noticed that the victim had what looked like "a new injury off of her nose." Henry left the room and went to the nurse's station to find someone who could tell her the victim's name. The appellant got a card with the victim's name on it out of his wallet and gave it to Henry; his hand was shaking. Henry said that she returned to the trauma room, that the victim's clothes were off, and that the victim appeared to have "some old type injuries to her body and some new type injuries to her body." Due to the injuries, Henry telephoned the police. She said that the hospital staff used medication and a defibrillator to try to resuscitate the victim and that they worked on the victim for about fifty minutes. The victim was declared dead at 1:10 p.m. On cross-examination, Henry testified that it was not unusual for someone to be trembling after bringing an ill person to the hospital.

Dr. Miguel LaBoy, an assistant medical examiner for Shelby County, testified as an expert in forensic pathology that he performed the victim's autopsy on May 31, 2009. The victim was forty inches tall and weighed thirty-one pounds. Dr. LaBoy conducted an external examination and found seven bruises on the victim's head. Specifically, he found bruises on the left and right side of her forehead, on her left cheek, on the left side of her chin, and inside her upper lip. He also found ten abrasions on the victim's head. Specifically, he found abrasions on her forehead, left eyelid, left cheek, both nostrils, and inside her bottom lip.

Dr. LaBoy testified that a bruise extended from the victim's right shoulder to her right arm and covered the sides, front, and back of her arm. She also had two abrasions on the front of her right arm, an abrasion on the back of her right index finger, and an abrasion on her right middle finger. The victim had a bruise from her left shoulder onto her left arm, an abrasion on the back of her left shoulder, an abrasion on the back of her left arm, two abrasions on the inside of her left arm, a u-shaped bruise on the front of her left forearm, and a u-shaped bruise on the back of her left forearm. A bruise was near the center of the victim's chest, and she had bruises on the left and right sides of her chest. She also had an abrasion on the right side of her chest and on the right side of her lower abdomen. Dr. LaBoy found two abrasions on the right side of the victim's upper back, a bruise on her back, and two abrasions on the upper part of her right buttock. He found a u-shaped bruise on her right

thigh; a u-shaped bruise on the back of her right knee; two abrasions on her right calf; and two abrasions on her left thigh, close to her left buttock. A bruise was on the back of her left knee, and an abrasion with a scab was on the front of her left leg. The victim had multiple scars on her thighs. Dr. LaBoy x-rayed the body but saw no obvious fractures.

Dr. LaBoy testified that he also conducted an internal examination of the victim. The victim had multiple contusions throughout the front of her scalp that matched the bruises on her forehead. She had a bruise in the top of her scalp and a bruise in her right temporal scalp with hemorrhaging of the right temporalis muscle, meaning the impact was more severe than merely causing bruising to the skin. The victim's skull was not fractured. However, she had a lethal subdural hematoma on the left side of her brain and a "patchy" subarachnoid hemorrhage on her brain's right hemisphere. An accumulation of fluid, also known as edema, was on the outer surface of her brain. He said an area on the right side of her brain had a yellow discoloration, meaning the area had hemorrhaged previously but had "resolved." The victim also had hemorrhaging in the area around one of her optic nerves and throughout the retina of her eye. Dr. LaBoy stated that her injuries indicated blunt trauma to the head.

Dr. LaBoy testified that he did not find any trauma to the victim's neck, chest, or abdomen. He also did not find any evidence of sexual abuse. He said the victim had bruising on the "back aspect of her lungs," which could have been caused by an impact to the area. The victim had skeletal hemorrhaging on her shoulders, upper extremities, back, and lower extremities. He stated that the victim's cause of death was multiple blunt force injuries and that her manner of death was homicide.

On cross-examination, Dr. LaBoy testified that all of the victim's abrasions, except for the one with the scab, were recent injuries and that the bruise on the victim's chest was not consistent with CPR having been performed on the victim. He stated that any one of the victim's injuries could have been caused by a fall. However, all of the victim's injuries together could not be explained by a fall. The victim's u-shaped injuries were consistent with having been caused by a loop or the end of a loop. He stated that the yellow discoloration on the right side of her brain was a chronic or "past" injury; however, the injury on the left side of her brain was acute or recent, meaning within twelve hours of her death. He said that some of the injuries on the victim's back were "chronic" and that some were recent.

Officer Diana Dickerson of the Memphis Police Department (MPD) testified that on May 30, 2009, she responded to a call at Delta Medical Center and went into the victim's trauma room. The hospital staff was working on the victim. After the doctor pronounced the victim dead, Officer Dickerson began trying to find the victim's family. She met the

victim's mother, put the victim's mother into her patrol car, and began filling out paperwork.

Officer Robert Halliburton of the MPD testified that he responded to a call at Delta Medical Center on May 30, 2009, and put the appellant into the back of his patrol car. He stated that the appellant was calm but that the appellant said "something about worrying about going to jail." Officer Halliburton did not read the appellant his rights because the officer was just "watching over" the appellant and was not interrogating him. He stated that while they were sitting in the patrol car, the appellant said "something about picking up the child from the babysitter's." Officer Halliburton transported the appellant to the police department.

Gizelle Gagne, the Assistant Manager for LEDIC Management Group, testified that her employer managed the Somerset Apartments. On May 30, 2009, MPD officers questioned Gagne about 3639 Parkwin Drive, apartment number 4. The apartment was vacant at that time and had been vacant since March 24. An individual named Erica Parker lived in 3639 Parkwin Drive, apartment number 3. Gagne did not know anyone named Alecia or Chris who lived in either apartment.

On cross-examination, Gagne testified that she did not recognize the appellant's name. She acknowledged that she did not always know who lived with renters.

Officer Jeffrey Allen Garry of the MPD testified that he went to Delta Medical Center on the afternoon of May 30, 2009, photographed the victim's body, and collected evidence. He said that the victim had "multiple bruisings about her body" and that she had bruising and scarring on her lower body. A red substance, thought to be blood, was in the crotch area and along the left hip and buttock areas of her underwear. Officer Garry collected the victim's clothes. About 5:00 p.m., he went to a vacant apartment on Parkwin Drive and photographed the interior of the apartment. There was no evidence that anyone lived there. About 9:00 p.m., Officer Garry went to 481 Walker Street, apartment number 4; photographed the interior of the apartment; and collected evidence. The apartment had two bedrooms. One bedroom was the master bedroom, and the other was a child's bedroom with a twin bed. Officer Garry found two belts on the floor of the master bedroom. He said that one was a green plastic belt and that the other was black "with holes stamped." He found a black braided belt on the floor in the child's bedroom. Officer Garry took numerous photographs at all three locations and turned in the photo card containing the photographs to the police department's photo laboratory.

On cross-examination, Officer Garry testified that he used a swab to collect evidence off a wall in the apartment on Walker Street. He acknowledged that he did not know what substance was on the victim's panties.

Richard Brashier, the civilian supervisor for the MPD's photo laboratory, testified that Officer Garry photographed three scenes in this case and that a photo lab employee logged-in the photographs. One month before trial, the laboratory was asked to retrieve the photos. However, Brashier was only able to find the photographs Officer Garry took at the hospital.

William Tate testified that he and the victim's mother, Nekela Oliver, were working at Mimio.com on May 30, 2009. Oliver's shift ended at 12:00 p.m., and she left at that time. Later that day, police officers arrived at Mimio.com and spoke with Tate.

Nekela Oliver, the victim's mother, testified that she and the appellant met in 2008 while they were working at Mimio.com. She said that they had an intimate relationship and that their relationship was good at first. About two months after they met, they began living together in a duplex on Jasmine Cove. The victim and her brother, who was six years old, lived with them. Later, they moved into an apartment on Walker Street. Oliver continued to work at Mimio.com, but the appellant no longer worked there and looked after the children while Oliver worked. Oliver said that before she met the appellant, a babysitter named Alecia looked after the victim. Alecia had a boyfriend or a brother named Chris.

Oliver testified that about two weeks before the victim's death, she started sending the victim to daycare "because of the bruises that [she] was seeing." Oliver saw knots on the victim's head, carpet burns on her nose, and bruises on her arm. Oliver said that one time, the victim's lips were "puffy." She asked the appellant about the victim's injuries. Oliver also asked the victim, and the victim told Oliver that the appellant had whipped her.

Oliver testified that she whipped the victim's legs with switches from trees and that the switches left welts on the victim. Oliver also whipped the victim with a belt; however, she used the belt over the victim's clothes. At the time of the victim's death, Oliver had not whipped the victim since she started daycare two weeks earlier. Oliver said she sometimes whipped the victim because the victim urinated on herself. Oliver never punched or kicked the victim and never made her run in the apartment. She said she saw the appellant force her son and the victim to run laps one time. She said that she asked him why and that he told her, "'Both of them just get on my nerves.'" She said she got upset and told the appellant not to put his hands on the children anymore.

Oliver testified that on the night of May 29, 2009, the victim fell asleep with her clothes on, and Oliver put her to bed. There were no marks on the victim's head, shoulders, back, arms, or legs. The next morning, Oliver had to be at Mimio.com at 6:00 a.m. Daycare was closed, so the appellant was supposed to look after the children. The appellant drove Oliver to work in Oliver's truck while the children remained sleeping in the apartment. About 10:00 a.m., Oliver telephoned the appellant. He told her that the victim was asleep and that

-5-

her son was playing a game. Oliver's shift ended at noon, but the appellant did not pick her up on time. She said that about 12:15 p.m., the appellant "came storming down the street." When Oliver got into the truck, she saw the victim lying across the appellant's lap. The victim had a knot on her head, carpet burns on her face, and bruises on her arms. The side of her face also was bruised. Oliver said she picked up the victim and asked the appellant, "'What happened?'" She said he told her that the victim had "'peed'" on him and that "'I didn't mean to do it. I'm sorry.'" Oliver told the appellant to drive to the hospital. The appellant drove to Delta Medical Center, and Oliver rushed the victim inside.

Oliver testified that someone cut the victim's shirt open, that she saw bruises on the victim's chest, and that she began "hollering." The appellant came inside and kept telling Oliver that he was sorry, that the victim had urinated on him, and that he had whipped her. Oliver said the appellant told her that "'I'm going to go to jail for life'" and that "'[w]e could tell them [the children] went to Alecia's[.]'" When the police arrived at the hospital, they separated Oliver from the appellant, and she did not see him again.

Oliver testified that she told the police her children had been to Alecia's house that day. She gave the police Alecia's address, which was apartment number 4 in Somerset Apartments. She said she lied to the police because she was "just stupid" and "didn't want to lose nobody at the time." The police took Oliver to the police department and interrogated her. At some point, Oliver admitted to them that the victim had not been to Alecia's home. She said that she was indicted for being an accessory after the fact, that the State had not offered her anything in exchange for her testimony, and that she was testifying for her "baby."

On cross-examination, Oliver testified that she did not remember telling the interrogating officer that she whipped the victim with a switch, causing the victim's legs to bleed, one week before the victim died. She said she told the officer that she whipped the victim two weeks before the victim died. Oliver denied taking off the victim's clothes; whipping her, causing her to bleed; and putting her in the bathtub. She also denied shutting the door to the victim's bedroom so that her son could not see her whip the victim. She acknowledged that she used belts to whip her son and the victim. Oliver never saw the appellant whip the victim, causing the victim to bleed. She said that the tile floor in the victim's bedroom was hard. She said she had not made a "deal" with the State.

Nine-year-old Martavion Oliver, the victim's older brother, testified that he currently lived with his father and grandmother. He said that the appellant used to be his mother's boyfriend and that he called the appellant "Uncle." At the time of the victim's death,

Martavion[1] was living with his mother, Nekela Oliver; the appellant; and the victim in an apartment on Walker Street. Martavion shared a bedroom with the victim, and the appellant shared a bedroom with Oliver. Martavion was in the second grade and attended elementary school, and the victim went to daycare. Before Oliver began dating the appellant, the victim stayed with a babysitter while Oliver worked. Martavion acknowledged that the babysitter's name was Alecia.

Martavion testified that while he lived with the appellant, he saw the appellant hurt the victim. The appellant would hit the victim on her head and arm with a wooden brush. He also hit her with an extension cord and belts. One of the belts he used was Oliver's green plastic belt. Martavion said the appellant would punish the victim because she "used to frown up." He made a face to the jury, demonstrating what he meant by "frown up." He said that the victim's making the face angered the appellant and that the appellant whipped her. The appellant also made the victim run in the apartment. He said that the victim had to run down the hallway and "make a loop in the den" and that she had to run until her mother got home. The State asked if the appellant made the victim run for a long time or a short time, and Martavion answered, "Halfway long." Martavion also saw the appellant punch the victim's arm and thump her in her mouth and saw Oliver whip the victim with a switch or a belt. He said he never saw anyone punch the victim in the mouth or kick her.

Martavion testified that on May 30, 2009, he and the victim were with the appellant while his mother was at work. The appellant hit the victim with the brush, a belt, and the extension cord. Martavion said that the appellant punished the victim because she "[f]rowned up" and that the victim wet her pants while the appellant was holding her. The State asked if the appellant made the victim run that day, and Martavion said, "I don't think so." However, shortly thereafter, the State asked him, "[D]id she wet herself before or after she had to run?" He answered, "Before. No, after, when she had to run[.]" Martavion ate a hotdog in the kitchen while the victim was running. He said that he heard the victim crying and that she had to keep running or the appellant would whip her. At some point, the victim stopped running because she was tired. Martavion said he knew she was tired because he heard her breathing hard.

Martavion testified that after the victim wet herself, the appellant put her on her bed and changed her clothes. He said that the appellant told the victim to "fold [the] cover" on her bed and that the victim looked at the cover but wanted to sleep. The appellant allowed the victim to go to sleep. While the victim was sleeping, two children came to the apartment, and the appellant cut their hair. Later, the appellant told Martavion to check on the victim.

---

[1]Because the witness and his mother share a surname, we will refer to him by his first name for clarity.

Martavion said that he felt for her heartbeat but that her heart was not beating. The appellant tried to give her water, but she coughed it up. The appellant picked up the victim and carried her outside to Oliver's truck. Martavion said that he got into the backseat, that the appellant put the victim into the backseat, and that the appellant drove to the "[c]orner store." The appellant went inside and came out with a white bottle of rubbing alcohol. The appellant rubbed the alcohol around the victim's mouth to try to wake her. The victim did not wake up, so the appellant drove to Mimio.com to pick up Oliver. When Oliver got into the truck, she started crying. The appellant drove to the hospital, and Oliver carried the victim inside. The State asked Martavion what the victim had been doing the last time he saw her awake, and he said, "She was still running."

On cross-examination, Martavion acknowledged that Oliver would take off the victim's clothes and whip her. Sometimes, Martavion saw blood running down the victim's legs. He acknowledged that Oliver whipped the victim, drawing blood, a few days before the victim died. Martavion also saw Oliver use her hand to hit the victim, and he acknowledged that he saw Oliver hit the victim a couple of days before her death. He acknowledged that Oliver whipped the victim regularly, that Oliver used a switch and a belt with holes in it, and that the victim cried. He acknowledged that one of the reasons the appellant made the victim run was so she would get tired and want to go to sleep.

Martavion acknowledged that after the victim stopped running on May 30, the appellant put her on the bed he shared with Oliver and told her to go to sleep. Martavion said that when he checked on the victim, her heart was not beating. He acknowledged that he gave a statement to Pat Lewis on June 2, 2009, and that he told Lewis the victim's heart was beating when he put his hands on her chest. He said he told Lewis the truth. He also acknowledged that he told Lewis the victim was acting "funny" on the morning of May 30 and that the victim fell and hit her head on the floor while she was running. The appellant picked up the victim, carried her to his bedroom, and put her on the bed. The appellant told Martavion to put some clothes on the victim, so Martavion put clothes on her. Shortly before they left to pick up Oliver, the appellant tried to give the victim water, but she coughed it up. He acknowledged that he and the State had gone over his testimony before trial. On redirect examination, Martavion testified that the victim started acting "funny" after the appellant made her run.

Sergeant William Dwayne Merritt of the MPD testified that the appellant arrived at the police department about 3:00 p.m. on May 30, 2009. Sergeant Merritt advised the appellant of his Miranda rights and interviewed the appellant. The appellant told him the following: That morning, the appellant woke about 6:00 a.m., drove Nekela Oliver to work, and returned to the apartment where he had left Martavion and the victim. The appellant was a self-employed barber and was expecting people to come to the apartment for haircuts, so

-8-

he drove the children to an apartment complex to drop off the victim with her babysitter, Alecia. The appellant left the victim with Alecia, and he and Martavion returned home. About 11:00 a.m., the appellant received a telephone call from Alecia's boyfriend, Chris. Chris told the appellant, "'You need to come over here. Something's wrong with your baby.'" The appellant and Martavion went to the apartment complex, and the appellant saw Chris carrying the victim out of apartment number 3. The appellant took the victim into his arms and carried her to Oliver's truck. He noticed she had some foam in her mouth and wiped it away. The appellant returned to apartment number 3 and saw Alecia's and Chris's three-year-old daughter standing in the apartment. The appellant said that the apartment looked "lived-in" and that he returned to the truck. At some point, the appellant performed CPR on the victim. He put rubbing alcohol on her face, but she was not breathing. The appellant picked up Oliver from work, and they went to the hospital.

Sergeant Merritt testified that he stopped the interview and located a driver's license photograph of Alecia. Her address was listed as 3639 Parkwin Drive, apartment number 3. Sergeant Merritt showed the photograph to Oliver, who was in a separate interview room. He also showed the photograph to the appellant. Sergeant Merritt said the appellant "wouldn't come out and say that was her, but he looked at it, and he -- 'Well, that looks like her,' was his response." About 5:00 p.m., Sergeant Merritt, another officer, and the appellant went to 3639 Parkwin Drive. The officers went to apartment number 3 and spoke with the people who lived there, but they did not know the appellant and had never babysat the victim. The appellant told the officers that Alecia and Chris lived in apartment number 4, so the officers went to that apartment. It was vacant.

Sergeant Merritt testified that he and the appellant returned to the police department and that he spoke with Oliver. Sergeant Merritt talked with the appellant again and told him that his story was inconsistent with Oliver's story. The appellant admitted that he had lied about Alecia. He told Sergeant Merritt that he had whipped the victim with a green belt three times that day and that he had made her run around the apartment. Sergeant Merritt recalled, "I think there was some of the whipping, and then she was made to run, and then I think there was some more whipping later on in the day." After the last whipping, the appellant put the victim to bed. He cut hair for two people, checked on the victim, and found her in distress. The appellant picked her up, put her in the truck, picked up Oliver, and drove to the hospital. The appellant told Sergeant Merritt that it was Oliver's idea to blame Alecia and Chris for the victim's injuries. On June 1, 2009, Sergeant Merritt searched Oliver's truck, a Chevrolet Tahoe, pursuant to a search warrant and found a bottle of rubbing alcohol.

Sergeant Merritt read the appellant's transcribed statement into evidence. According to the statement, the appellant whipped the victim three times on May 30 because "she peed, she would not take a bath, and she would not change her clothes." The appellant "made her

-9-

start running back and forth in the hallway so that [he] would not spank her [anymore]." When customers arrived for their haircuts, he told the victim to lie down on the bed. The victim kept crying, and the appellant "thought that was her normal crying because she got a whipping." The victim went to sleep. The appellant said that he lied about Alecia because he was scared and that "I am sorry this happened. I did not mean for it to happen."

On cross-examination, Sergeant Merritt testified that the appellant arrived at the police department about 3:00 p.m. but did not give his statement until 8:00 p.m. Sergeant Merritt did not question the appellant continuously during that five-hour period. The appellant would have been offered food and drink during that time. At the conclusion of Sergeant Merritt's testimony, the State rested its case.

The jury convicted the appellant of first degree premeditated murder perpetrated during aggravated child abuse and aggravated child abuse, a Class A felony. After a sentencing hearing, the appellant received concurrent sentences of life for the murder conviction and fifteen years for the aggravated child abuse conviction.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions because although he intended to punish the victim on May 30, 2009, nothing shows that he inflicted the punishment to cause her death or that he premeditated the killing. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant

has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree felony murder is not a premeditated killing. Instead, it is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code. Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit the [underlying felony]." Tenn. Code Ann. § 39-13-202(b). A defendant is guilty of aggravated child abuse when the defendant commits the offense of child abuse and the conduct results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2). At the time of the victim's death, serious bodily injury was defined as bodily injury that involved

(A) a substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement; or

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E).

Taken in the light most favorable to the state, the evidence is sufficient to support the convictions. Nekela Oliver testified that she left the victim in the appellant's care while she worked on May 30, 2009. Oliver's son, Martavion, testified that the appellant hit the victim with a brush, an extension cord, and a belt and that he made her run. When the victim was so tired that she could not run anymore, the appellant put her to bed. Later, he discovered that he could not wake her. He tried to give her some water, but she coughed it up. The appellant put the victim in the truck and picked up Oliver from work. Oliver said the victim was lying across the appellant's lap, unresponsive. They took the victim to the hospital, but

she was not breathing and could not be resuscitated. Dr. LaBoy testified that he found recent injuries to the victim's brain, including a lethal subdural hematoma, that were caused by blunt force trauma and recent bruises and abrasions all over her body. The victim's injuries could not be explained by a fall. Although the evidence established that Oliver physically abused the victim, nothing indicates that she inflicted the type of injuries that caused the victim's death. The appellant told Sergeant Merritt that he whipped the victim three times that day and made her run, and he does not dispute that he was the victim's sole caregiver at the time of her death. The evidence is more than sufficient to support the appellant's convictions.

## B. Appellant's Prior Bad Acts

The appellant claims that the trial court erred by allowing witnesses to testify about his physically abusing the victim before May 30, 2009, because the testimony was inadmissible propensity evidence and was highly prejudicial. The State argues that the trial court properly allowed the witnesses to testify. We agree with the State.

On the morning of trial, the State filed a motion pursuant to Rule 404(b), Tennessee Rules of Evidence, notifying the appellant of its intent to introduce testimony about the appellant's abusing the victim prior to the day of her death. Before opening statements, the trial court held a hearing on the motion. During the hearing, the State advised the court that the appellant told Sergeant Merritt he punished the victim on May 30 for urinating on herself, refusing to change her clothes, and refusing to take a bath. The State argued that Nekela Oliver and Martavion should be allowed to testify about the appellant's prior abuse of the victim in order to show that the appellant intended to physically abuse the victim on May 30 and to provide a "contextual background" for the jury about the victim's injuries. The State also argued that the probative value of the evidence far outweighed the danger of unfair prejudice.

Martavion Oliver testified at the hearing that "the truth" means "[d]on't lie" and that he promised to tell the truth. He said that while he lived with the appellant, the appellant hurt him by hitting him with his mother's green belt. The appellant also hit Martavion's lip with the appellant's fist and made him run in the apartment until his mother got home from work. He said that when he got tired, the appellant "would just push" him, causing his head to hit the carpet. The appellant also hurt the victim, hitting her with a brush, an extension cord, and a green belt. The appellant used the "wood part" of the brush to hit the victim on her head, and he used the belt to hit the victim on her leg. Martavion said that his mother whipped him and the victim but that she never punched them or made them run. On the day of the victim's death, the appellant hit the victim with the brush. He also made her run because she "frowned up." Martavion said that the appellant told the victim to fold up her clothes but that

-12-

the victim "didn't know how to do it." He said the appellant "beat" the victim and told her to go to sleep.

On cross-examination, Martavion testified that the appellant would hit the victim on her head and on her arm with the brush. He also would spank her leg. Martavion acknowledged that the appellant always said he did not want to hurt the victim. Martavion said that on the day of the victim's death, the victim "was just running, and then she got real tired. She couldn't talk, and she was constantly crying." He said that she fell, got up, kept running, and did not fall again." However, he later acknowledged that the victim fell "a lot of times" that day. Defense counsel asked Martavion who put "marks" on his face and arms, and he said, "My mama and Antonio."

Nekela Oliver testified that prior to May 30, 2009, she saw bruises on the victim's arm and knots on the victim's head. She also said that the victim's hands were swollen and that the victim had bruises on her legs, a carpet burn on her nose, and "like a green bruise on the side of her face one time." Oliver said that she would use her hand to hit the victim or a switch to whip the victim's leg "every now and then" but that she did not cause the injuries she saw on the victim. One time, the victim's lips were swollen. Oliver said she asked the appellant, "What's wrong with her lips[?]" She said the appellant told her, "'She's frowning at me, and I hit her in the mouth.'" Oliver said the appellant told her three or four times that the victim was "frowning at him." She said that she asked the victim about the injuries "a couple of times" and that the victim said the appellant hit her. About two weeks before the victim's death, Oliver got tired of seeing bruises on her. The appellant said he could not watch the victim anymore, so Oliver put the victim in daycare. On May 30, 2009, Oliver was concerned about leaving the victim with the appellant.

On cross-examination, Oliver testified that she would whip the victim with two thin switches plaited together. She also whipped the victim with a belt on top of the victim's clothes. Oliver denied that her whipping the victim caused the victim to bleed. At the time of the victim's death, Oliver had not whipped her for two weeks.

On redirect examination, Oliver stated that after the appellant said he could not look after the victim anymore, Oliver put her in daycare the next day. The State asked her, "What made you move so quickly?" Oliver answered, "Because he was mad, very angry, and he . . . stated, 'I saw myself hurting her[.]'"

At the conclusion of the testimony, the State maintained that the evidence was admissible to show the appellant intended to physically abuse the victim on the day of her death. The defense argued that the probative value of the evidence was outweighed by its prejudicial effect. The trial court withheld ruling on the issue, stating that it would take the

-13-

matter under advisement.

Before Nekela Oliver and Martavion testified at trial, the trial court announced its ruling. The trial court noted that the medical examiner had testified about the victim's "old injuries" and that the defense had cross-examined him extensively about them. The trial court held that, in light of the testimony about the victim's previous injuries, Oliver and Martavion should be allowed to testify about the appellant's prior abuse of the victim in order to avoid creating "a chronological or conceptual void in the State's case." The trial court also held that not allowing them to testify would result in jury confusion. Finally, the trial court determined that the probative value of the evidence was "tremendous" and that the probative value was not outweighed by the danger of unfair prejudice.

Tennessee Rule of Evidence 404 provides as follows:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> > (1) The court upon request must hold a hearing outside the jury's presence;
> >
> > (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> >
> > (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> >
> > (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b)

-14-

evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. If the evidence is relevant, then, upon request, the court will proceed to a Rule 404(b) hearing.

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

In this case, the trial court found that testimony about the appellant's prior physical abuse of the victim was relevant to provide a contextual background for the jury. In State v. Gilliland, 22 S.W.3d 266, 271-72 (Tenn. 2000), our supreme court held that "contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an 'other purpose' under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case." Id. at 272. The court explained that

> when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Id.

Turning to the instant case, the crux of the State's proof was that the victim died of the injuries she received on May 30, 2009, while the appellant was her sole caregiver. Ordinarily, under those circumstances, we would agree with the appellant that the absence of testimony about his previous abuse of the victim would not create a chronological or

-15-

conceptual void in the State's case and that Oliver's and Martavion's testimony about the appellant's previous abuse of the victim was inadmissible. However, the appellant tried to insinuate through his cross-examination of the State's witnesses, particularly Dr. LaBoy, that the victim's mother caused the injuries that ultimately killed the victim. Moreover, during closing arguments, defense counsel argued to the jury that the past injuries inflicted by Oliver could have resulted in the victim's death and that the appellant did not "knowingly and intentionally [inflict] the harm on this child knowing the consequences." This court has stated,

> In the event the defendant claims that the injury was accidentally inflicted, inflicted by someone else, or the defendant lacked the intent to harm the victim, proof that the defendant was responsible for prior acts of abuse may be probative of the defendant's intent to harm the child or to show that the act of abuse was not accidental.

State v. Brian Larice Cureton, No. M2002-00835-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 848, at **46-47 (Nashville, Oct. 8, 2003) (citing State v. Dubose, 953 S.W.2d 649, 546 (Tenn. 1997)). Therefore, we conclude that the testimony was admissible to show that the appellant caused the blunt force trauma to the victim's head, that he did so intentionally, and that the victim's injuries were not the result of a mistake or accident. Additionally, the testimony was highly relevant, and we conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Therefore, the appellant is not entitled to relief.

## C. Prior Conviction

Next, the appellant contends that the trial court erred by refusing to allow him to question Nekela Oliver about a prior misdemeanor conviction. The State argues that the trial court properly excluded the evidence. We agree with the State.

The record reflects that on June 6, 2009, Oliver was arrested and charged with felony child abuse or neglect. The victim was her son, Martavion. Oliver pled guilty to misdemeanor child neglect and was granted judicial diversion. She successfully completed diversion on January 15, 2011, three months before the appellant's trial, and the conviction was expunged. On the morning of the appellant's trial, Oliver's attorneys filed a motion requesting that the trial court prohibit the appellant from questioning her about the child neglect conviction because the conviction had been expunged. Counsel also argued that the appellant could not ask Oliver about the conviction because the crime was a misdemeanor and did not involve "moral turpitude." The trial court expressed concern about counsel's

-16-

standing to file the motion. Nevertheless, the court held that the appellant could not ask Oliver about the prior misdemeanor conviction.

As noted by the State, Rule 609, Tennessee Rules of Evidence, provides for the use of prior convictions to impeach witnesses. However, one of the requirements of the Rule is that the "crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." Tenn. R. Evid. 609(a)(2). Given that the crime was a misdemeanor and did not involve dishonesty or false statement, the trial court correctly held that the appellant could not cross-examine Oliver about it.

We note that the appellant also contends that the trial court erred by granting the motion because "the only person objecting was [Oliver's] attorney not the District Attorney General." However, the appellant has failed to cite to any authority in support of his argument as required by Rule 27(a)(7), Tennessee Rules of Appellate Procedure. Therefore, the issue is waived. See Tenn. Ct. Crim. App. R. 10(b).

### D. Mistrial

The appellant claims that the trial court erred by failing to grant his motion for a mistrial when Sergeant Merritt "testified about sexual abuse upon [the victim] after the Court granted a Motion in Limine barring such testimony." The State argues that the trial court properly denied the motion for a mistrial. We agree with the State.

The appellant filed a pretrial motion to prohibit any evidence that the victim was sexually abused. At a hearing on the motion, the State advised the court that no one had been indicted for sexually abusing the victim and that "[w]e did not intend to put that evidence out." The trial court granted the appellant's motion and asked the State, "Your witnesses will be instructed accordingly?" The State answered, "Yes, sir."

At trial, Dr. LaBoy testified that he found no evidence of sexual abuse to the victim. When Sergeant Merritt took the stand, the State asked him how he became involved in the case, and he testified that he was asked to investigate the victim's death. He also stated, "She had passed away and she had some evidence of physical and sexual abuse." Defense counsel objected, and the parties approached the bench. The State acknowledged, "I did not advise him. . . . This is . . . my fault." Defense counsel asked for a mistrial, but the trial court denied the motion, stating, "It was just one little comment that was made." Moreover, the trial court instructed the jury as follows:

> Ladies and gentlemen, with regard to the comment about sexual

abuse, you're to disregard that, that testimony. The examination that was done, and there's no evidence of sexual abuse, so that statement, please disregard it. You can use it for no reason.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Additionally, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In this case, Dr. LaBoy had already informed the jury that he conducted an internal and external examination of the victim and found no evidence of sexual abuse. Moreover, after Sergeant Merritt's improper comment, the trial court immediately instructed the jury to disregard it because no evidence of sexual abuse existed. Ordinarily, juries are presumed to follow the instructions given by a trial court. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). Therefore, we conclude that the trial court did not err by denying the appellant's motion for a mistrial.

### E. Closing Arguments

The appellant claims that the trial court erred by failing to give a curative instruction when the State argued facts outside the record during closing arguments. The State argues that the appellant has waived the issue because he failed to request a curative instruction. We conclude that the appellant is not entitled to relief.

While Martavion was testifying during the Rule 404(b) hearing, the State asked him, "When [the appellant] was hitting you, did he ever tell you what you should do, how you should take it?" Martavion said the appellant told him, "'Take it like a man.'" During the State's rebuttal closing argument, the prosecutor said, "And then after Nekela Oliver came off her story and that house of cards tumbled, then what did he do? Did he man up like he told Martavion to do when he took his whippings? What did he do? He didn't man up." Defense counsel interrupted and objected, stating, "That's not in evidence." The trial court answered, "I'll allow it. It's basically based on the testimony. I'll allow it. It's argument."

It is well-established that closing argument is an important tool for both parties during a trial and, therefore, that counsel is generally given wide latitude during closing argument.

-18-

See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). Nevertheless, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]
>
> (3) the intent of the prosecutor in making the statement[;]
>
> (4) the cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. Moreover, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007).

Turning to the instant case, Martavion did not testify at trial that the appellant told him to "take it like a man." Therefore, the prosecutor's argument was not based on evidence introduced at trial and was improper. No curative measures were taken. However, the prosecutor's statement was brief, and there is no evidence she intended to unduly prejudice the appellant by her remarks. Moreover, we have found no other errors in the record, and the

-19-

State's case was strong.  Therefore, we conclude that the appellant is not entitled to relief.

### F.  Oliver's Favorable Treatment

Finally, the appellant claims that the trial court erred by refusing to grant his motion for a new trial when the State failed to disclose that Oliver received favorable treatment in exchange for her testimony.  The State claims that the appellant is not entitled to relief. We agree with the State.

On direct examination, Oliver testified that as a result of the victim's death, the State indicted her for being an accessory after the fact.  The State asked, "Are you here today testifying because we have offered you any type of deal?"  Oliver answered, "No, ma'am." The State asked, "Matter of fact, you have no idea what's going to happen with that case, do you?" Oliver stated, "No, ma'am." On cross-examination, the following exchange occurred:

> Q.  And you're expecting if you -- for your testimony to receive some favorable treatment, aren't you?
>
> A.  No, sir.
>
> Q.  You're not expecting any?
>
> A.  What [do] you mean?  A deal or something?
>
> Q.  Some sort of deal?
>
> A.  No, sir.
>
> Q.  You haven't been told by your lawyer that for your testimony that you're not going to get some consideration for your testimony today against [the appellant]?
>
> A.  No, sir.
>
> Q.  Nothing at all?
>
> A.  No, sir.
>
> Q.  Are you just supposed to wait and see what happens?

A.  Wait and see what happens.

Less than two months after the jury convicted the appellant, the State nolle prosequied the charge against Oliver.  In his amended motion for new trial, the appellant claimed that he was entitled to a new trial because the State failed to disclose that Oliver was going to receive favorable treatment for her testimony.

At the motion for new trial hearing, the State advised the trial court, "What I can tell you unequivocally is that there was no deal."  However, the State also told the court, "The agreement was that [Oliver] wanted to testify because we felt like she would help our case against [the appellant], that if she testified truthfully after she testified we would decide what we wanted to do with her case."  The State advised the court that it had informed defense counsel before trial of the "agreement" and that defense counsel's cross-examination of Oliver reflected that the State had informed defense counsel.

Martha Jackson testified for the State that she was the Court Reporter Administrator for the criminal courts.  At the State's request, Jackson played an audio recording of part of defense counsel's cross-examination of Oliver.  During the portion played, Oliver stated that she was going to "[w]ait and see what happens" to her pending charge of being an accessory after the fact.

Jennifer Nichols and Carrie Shelton, the assistant district attorneys general who represented the State at the appellant's trial and at the motion for new trial hearing, also testified.  Nichols stated that she informed defense counsel before trial that Oliver had been granted judicial diversion for the misdemeanor committed against Martavion. Nichols said she also informed defense counsel that Oliver would be testifying against the appellant, that the State had not made a "deal" with Oliver, and that Oliver "was supposed to give truthful testimony and that after that was over we would decide [what to do about her charge for being an accessory after the fact]."  Nichols acknowledged that she did not inform defense counsel before the appellant's trial that the charge would be nolle prosequied.  She said she did not inform him because "[we] did not know what we were going to do with the case."

Shelton testified that she had never prosecuted a case for accessory after the fact. After the appellant's sentencing hearing, Shelton was concerned about the State's ability to prove its case against Oliver.  Shelton also realized that Oliver "finally understood . . . that she had one-hundred percent failed her child."  Shelton said that after she read the victim impact statement Oliver prepared, she "felt that it would not have served justice at this point to prosecute her."  Therefore, Shelton decided not to pursue the case against Oliver.

As this court has stated,

> It is a fundamental principle of law that an accused has the right to cross-examine prosecution witnesses to impeach the credibility or establish the motive or prejudice of the witness. This includes the right to cross-examine a prosecution witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness.

State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). When the State enters into an agreement with a witness in exchange for the witness' cooperation, basic fairness dictates that all of the compromise is open for scrutiny and inquiry. State v. Ingram, 638 S.W.2d 428, 430 (Tenn. Crim. App. 1982).

The trial court found that the State had an agreement with Oliver "for everyone to sit down afterwards and maybe the lawyers would be able to convince the prosecutors and the prosecutors [would] either dismiss, agree to probation, whatever." However, in a written order, the trial court ruled that the appellant was not entitled to relief because "an intentional failure to communicate to the defendant details of the agreement between the State and Oliver did <u>not</u> occur." The trial court also held that, regardless, any error was harmless due to the strength of the State's case.

We agree with the trial court that the appellant is not entitled to relief on this issue. In <u>Asata Lowe v. State</u>, No. E2006-02028-CCA-MR3-PC, 2008 Tenn. Crim. App. LEXIS 176, at *75 (Knoxville, Mar. 10, 2008), this court held that an "arrangement," like the one in this case, between the State and a testifying witness "is simply too vague to be an 'offer' of favorable treatment and does not have to be disclosed to a defendant." In any event, Nichols informed defense counsel that the State would decide what to do about Oliver's case after she testified truthfully against the appellant, and defense counsel questioned Oliver about "hav[ing] to wait and see what happens." Therefore, the trial court properly denied the appellant's motion for a new trial.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE