IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2017 Session

## STATE OF TENNESSEE v. MARIA DELETA FLOWERS, AKA MARIA PALMER

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-2248    Steve R. Dozier, Judge**

_____

### No. M2017-00425-CCA-R3-CD

_____

The Appellant, Maria Deleta Flowers, was convicted in the Davidson County Criminal Court of reckless aggravated assault, a Class D felony, and was sentenced to four years in confinement.  On appeal, the Appellant contends that the evidence is insufficient to support the conviction and that the State committed prosecutorial misconduct during closing arguments.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Sais Phillips Finney, Nashville, Tennessee, for the appellant, Maria Deleta Flowers.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In September 2015, the Davidson County Grand Jury indicted Scottie Mofield, Ricky Palmer, and the Appellant for the aggravated assault of Robert Vaughn.  The Appellant was tried jointly with her codefendants.

At trial, the fifty-year-old victim testified that he was six feet, one inch tall and that his weight fluctuated between one hundred sixty and one hundred eighty-five

pounds. In June 2015, he lived in a homeless camp near Mill Creek behind the Casa Linda Apartments on Murfreesboro Pike and sold The Faith Unity newspaper to make money. About 10:00 p.m. on June 5, the victim walked "[t]hrough the woods and then down the sidewalk just a short ways and then across the street" to a store. He saw the defendants outside and went into the store to buy a bottle of beer and a pack of cigarettes. When he came out of the store, he set the bottle on the ground and began opening the pack of cigarettes. The Appellant approached and asked if the victim "could spare a cigarette and some of [his] drink." The victim told her that he "didn't have it to spare," and the Appellant pushed him backward. The Appellant told the victim that "nobody's going to drink the beer" and "smashed" the beer bottle onto the ground. The victim said that at that point, he was "assaulted from the back and side by the other two." Mofield and Palmer got the victim onto the ground and began kicking him and hitting him repeatedly with their fists. The victim said they kicked his face and "[a]ll around my skull, my chest, my back area, abdomen area, legs, all over." The victim tried to protect himself by covering his body. He also tried to stand up a couple of times but was "just beat back down to the ground." He said that he did not know how long the beating continued but that it seemed to go on "a long time." Finally, Mofield and Palmer "just quit," and the three defendants left. The victim said that a knife was in his pocket during the attack but that he never took it out of his pocket.

The victim testified that his face was swollen, that one of his eyes was completely swollen shut, and that his eyelid was "hanging down on the lower part of [his] face." He knew he was severely injured and walked back to his shelter in the camp as quickly as possible. His friend, Dane McPeak, helped him bandage his injuries and tried to stop his bleeding. The victim said he did not call 911 because he was in shock, feared for his life, and just wanted "a safe haven." He could not sleep and was in extreme pain.

The victim testified that the next day, McPeak spoke with Pauline Spalding, who was the manager of the Casa Linda Apartments, and that Spalding telephoned the paramedics and the police.[1] The police found the victim in the woods, walked him out to an ambulance, and tried to get him to go to a hospital. However, the victim refused, so the paramedics left. The victim said he did not tell the police who had assaulted him at that time because he was scared "of more to come."

The victim testified that later that day, he could not get his right eye to stop bleeding, and he became weak. Spalding was very concerned and convinced him to go to the emergency room. An ambulance transported him to Vanderbilt Hospital where a

---

[1] Judge John Everett Williams has taken the position that referring to witnesses by their last names, without common titles such as Mr. or Mrs., is disrespectful. However, in referring to witnesses without their titles, we mean no disrespect to the witnesses.

doctor "sewed [his] eyelid back on" and he saw an eye specialist. He had skull fractures, his nose was broken, and his jaw was broken in four places. The victim's eye socket was shattered, and the optic nerve in his right eye had been pulled loose, resulting in permanent blindness in that eye. The victim was discharged from Vanderbilt the next day because he did not have medical insurance but received follow-up treatment at Meharry Hospital. He later had surgery on his jaw and eye socket at Meharry.

The victim testified that after he was discharged from Vanderbilt, he spoke with the police and told them who was responsible for his injuries. The police showed him two, six-photograph arrays on July 31, and he identified Mofield and Palmer as the men who beat him. The police showed him a six-photograph array on August 1, and he identified the Appellant. At that time, though, he knew the Appellant only by her nickname, "[P]iggy." The victim said that prior to June 5, he had seen the defendants "moving up and down the streets" and that he had spoken with Palmer but had never talked with the Appellant or Mofield. At trial, the victim identified the Appellant as the woman who approached him outside the store and Mofield and Palmer as the men who beat him.

On cross-examination, the victim acknowledged that he was living in the homeless camp at the time of the attack because he had been evicted from Casa Linda. He also acknowledged having a prior felony conviction for selling drugs. He stated that after he came out of the store on June 5, Palmer, not the Appellant, was the person who asked him for some beer. The victim told Palmer no, so the Appellant approached the victim. She pushed him backward, picked up the beer bottle, and broke it. Mofield or Palmer then "punched" the victim on the side of his head behind his right ear. The victim stumbled, and Mofield and Palmer hit him a couple of times. The victim fell to the ground, and the men kicked, stomped, and punched him. During the beating, the Appellant "moved to the side." The victim denied arguing with the Appellant or grabbing her neck after she broke the beer bottle, and he acknowledged that Mofield and Palmer "jumped [him] for no reason." He said that he did not know which man hit him first, and he acknowledged that none of the defendants took anything from him. He also acknowledged that he spent less than twenty-four hours at Vanderbilt and that he walked out of the hospital unassisted.

Dane McPeak testified that on June 5, 2015, he was living with the victim "[o]n the shores of the Mill Creek off of Murfreesboro Pike." That night, the victim walked to the store for a pack of cigarettes. When he returned, he had been "severely beaten" and was bleeding from his nose, mouth, eyes, and ears. McPeak tried to clean up some of the blood and stop the victim's bleeding. However, McPeak did not have a first aid kit. He said that he "did the best [he] could" and that he stayed up all night with the victim. The next day, the victim "looked even worse" due to swelling, bruising, and continued

bleeding. McPeak trusted Pauline Spalding and told her what had happened. He returned to the woods and was present when the police arrived.

Detective Lukas Cantrell of the Metropolitan Nashville Police Department (MNPD) testified that a few days after June 6, 2015, he met with Pauline Spalding and the victim at the Casa Linda Apartments. Detective Cantrell observed "major physical injuries" to the victim's face and torso. The victim's eyes were almost swollen shut, and his torso was badly bruised and swollen. The victim told Detective Cantrell that "Ricky Palmer, Scottie, and a female named [P]iggy" assaulted him.

On cross-examination, Detective Cantrell testified that he took the victim's general statement. The victim told the officer that he did not name his attackers earlier because he was afraid of retaliation.

Pauline Spalding testified that she was the officer manager for the Casa Linda Apartments and that felons and "the homeless" made up ninety percent of the complex's residents. She stated that the complex's rules were very strict; that alcohol, drugs, and prostitution were not allowed; and that she immediately evicted anyone who violated the rules. The victim and Dane McPeak lived in separate apartments in Casa Linda prior to June 2015. However, Spalding had to evict the victim due to a problem with his roommate. Spalding also had to evict McPeak because he lost his job and could not pay the rent. In June 2015, the victim and McPeak were homeless and living "on the street."

Spalding testified that on June 6, McPeak told her that the victim had been "hurt really bad and needed some medical care." Spalding gave McPeak ten dollars to buy medical supplies for the victim. Later, though, Spalding decided to call the police. The police arrived at Casa Linda and walked behind the complex to look for the victim. Spalding went with them and saw a large amount of fresh blood. She could not find the victim, so she returned to the apartment complex. After looking for the victim for several hours, the police found him and brought him out of the woods to an ambulance. Spalding said that she saw the victim for the first time since the attack and that he looked "horrible" and "like something out of a horror show." The victim's jaw was dislocated and "hanging . . . down." Blood was flowing out of his right eye, his left eye was bloodshot, and his face was "black and blue." Spalding thought the victim should go to a hospital, but he refused. The paramedics left, and the victim walked back into the woods. Spalding said that she "got really upset" about the victim's condition, that she telephoned McPeak, and that she spoke with the victim. She told the victim that he and McPeak could move back into Casa Linda if he would go to the hospital. The victim agreed, so Spalding called an ambulance. After the victim was released from the hospital, he and McPeak moved into an apartment in Casa Linda. Spalding said that at the time of trial,

- 4 -

the victim and McPeak were still living there and that McPeak was working for her full time.

On cross-examination, Spalding testified that the first time the victim lived in Casa Linda, he had a female roommate named "Tammy." Spalding evicted Tammy due to a domestic violence incident. She explained that Casa Linda's policy was to evict everyone from an apartment and, therefore, that she also had to evict the victim.

Detective David Struder of the MNPD testified that he spoke with the victim sometime in the middle of July 2015 and that the victim told him what had happened on June 5. Detective Struder showed the victim photograph arrays, and the victim made positive identifications. Detective Struder tried to obtain video of the attack from the store where the attack occurred, but the store's cameras were not working on June 5. At the conclusion of Detective Struder's testimony, the State rested its case.

The thirty-two-year-old Appellant testified on her own behalf that she had been homeless since her father died in February 2014. In June 2015, she and her boyfriend, Scottie Mofield, were living under a bridge on Murfreesboro Pike. The Appellant's brother, Ricky Palmer, also was homeless and lived "on the other side of the bridge." On the night of June 5, the Appellant, Mofield, and Palmer were sitting outside Saint Mary's Market. She said that they were "finishing a beer" and that they had been sitting there fifteen to twenty minutes when the victim entered the store.

The Appellant testified that when the victim came out of the store, no one said anything to him. The victim lit a cigarette and was "just hanging around." The victim and Palmer "had a conversation, but it really wasn't nothing." However, at some point, the victim started "getting agitated" because the Appellant, Mofield, and Palmer would not leave the store. The Appellant said the victim wanted them to leave because he was "waiting on the dope man" and "the dope man wasn't going to serve" him if the three defendants were there. The victim "started cussing" the Appellant and calling her "bitches and whores." He walked toward her with a beer bottle in his hand, and she stood up because she was scared. She said that by the time she stood, the victim was right in front of her. The victim was angry, and the Appellant thought he was going to hit her, so she "pushed" the beer bottle out of his hand. She said that the bottle "busted" and that the victim "really got angry."

The Appellant testified that the victim grabbed her by her waist and that he called her a "[f***ing] bitch." Mofield and Palmer "helped" the Appellant and got the victim off her. She said that she, Mofield, and Palmer "stayed there for a minute" and then returned to the bridge. The Appellant thought the incident was over and did not think anymore about it. She said that prior to the incident, she knew the victim carried a knife.

- 5 -

She said that she had seen the victim "around" but that she had never talked to him before June 5.

On cross-examination by the State, the Appellant acknowledged that her nickname was "Piggy" and that she never saw the victim with a knife on June 5. She said that she and Mofield had been dating about four years at the time of the incident, and she acknowledged that she, Mofield, and Palmer were "quite close." After the victim came out of the store and had been standing outside about fifteen minutes, he got upset because the Appellant, Mofield, and Palmer would not leave. The Appellant acknowledged that the victim was beaten and bleeding. However, she never saw Mofield or Palmer touch him. The State asked if Mofield and Palmer forced the victim onto the ground and "caused a puddle of blood," and the Appellant answered, "They got him off of me, but I don't know if it was both of them. I don't know which one did it." She acknowledged that she was not injured on June 5 but said that she was "in fear [for] my life." The Appellant was arrested on August 1. At the time of her arrest, she weighed about two hundred fifty pounds and Palmer weighed about two hundred pounds.

On cross-examination by counsel for Ricky Palmer, the Appellant denied asking the victim for his beer or cigarettes. She stated that the victim wanted them to leave the store but that she told him no. The victim got angry with the Appellant and grabbed her waist. The Appellant stated that she never saw Mofield or Palmer do anything to the victim, that she did not know how the victim ended up on the ground, and that she did not see blood on the victim. She said she knew the victim carried a knife on his person because she had seen it "[c]lipped on his pocket" prior to June 5.

At the conclusion of the proof, the jury convicted the Appellant of reckless aggravated assault, a Class D felony, as a lesser-included offense of aggravated assault and convicted Mofield and Palmer as charged of aggravated assault. After a sentencing hearing, the trial court sentenced the Appellant as a Range I, standard offender to four years in confinement and ordered that she serve the sentence consecutively to a previous sentence.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support her conviction of reckless aggravated assault because the proof only shows that she pushed the victim and knocked the beer bottle out of his hand and does not show that she acted recklessly. The State argues that the evidence is sufficient because the Appellant initiated the attack by pushing the victim and breaking the bottle and was criminally responsible for the

subsequent beating by Mofield and Palmer.  We conclude that the evidence is sufficient to support the Appellant's conviction.

The indictment charged the defendants with aggravated assault, stating that they "intentionally or knowingly did cause serious bodily injury to" the victim.  During the jury charge, the trial court gave instructions on aggravated assault and the lesser-included offenses of facilitation of aggravated assault, reckless aggravated assault, facilitation of reckless aggravated assault, assault with bodily injury, and assault by offensive touching.  The court also instructed the jury on criminal responsibility and self-defense.  The jury convicted Mofield and Palmer as charged of aggravated assault but convicted the Appellant of the lesser-included offense of reckless aggravated assault.  Therefore, for purposes of this case, the State had to prove beyond a reasonable doubt that (1) the Appellant recklessly caused bodily injury to the victim and (2) the assault resulted in serious bodily injury to the victim.  See Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(1)(B)(i).

A person acts recklessly

> with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).  "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]"  Tenn. Code Ann. § 39-11-106(a)(2).  "Serious bodily injury" is defined as a bodily injury that involves:

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

- 7 -

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is eight (8) years of age or less

Tenn. Code Ann. § 39-11-106(a)(34).

Taken in the light most favorable to the State, the evidence shows that on the night of June 5, 2015, the Appellant; her boyfriend, Mofield; and her brother, Palmer, were sitting outside St. Mary's Market sharing a beer. When the victim came out of the store with his own beer and a pack of cigarettes, the Appellant asked if she could have some of the victim's drink and a cigarette. The victim refused to share, so the Appellant pushed him backward and smashed his beer bottle. Mofield and Palmer then savagely beat the victim while the Appellant stood nearby. The Appellant never tried to stop Mofield and Palmer from attacking the victim, and she did not attempt to aid the victim or call for help after the beating. Instead, she left the scene with her codefendants and returned with them to the bridge where the three of them resided.

In order to sustain the Appellant's conviction, the State was required to prove beyond a reasonable doubt that the Appellant was aware of but consciously disregarded a substantial and unjustifiable risk that caused bodily injury to the victim and that the assault resulted in serious bodily injury to the victim. The evidence unquestionably shows that the assault resulted in serious bodily injury. The evidence also shows that the Appellant instigated the assault by asking the victim for beer and then breaking the beer bottle when he refused to give it to her. In our view, a reasonable jury could have found that the victim was aware of but consciously disregarded the risk that her extremely aggressive behavior toward the victim in the presence of both her brother and her boyfriend, who had been drinking alcohol, would result in serious bodily injury to the victim. Accordingly, the evidence is sufficient to support the Appellant's conviction of reckless aggravated assault.

B. Prosecutorial Misconduct

The Appellant contends that the State committed prosecutorial misconduct during its rebuttal closing argument. The State argues that the prosecutor's argument was not improper and that the Appellant is not entitled to relief. We agree with the State.

In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d

758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997).  In making this determination, this court is guided by five factors:

> 1.  The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2.  The curative measures undertaken by the court and the prosecution.
>
> 3.  The intent of the prosecutor in making the improper statement.
>
> 4.  The cumulative effect of the improper conduct and any other errors in the record.
>
> 5.  The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).  We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment.  State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014).  "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper."  Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments.  See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix).  "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law."  State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument:  (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.  "In determining whether

statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Initially, we note that defense counsel did not make contemporaneous objections to any of the prosecutor's statements. A defendant's failure "to proffer contemporaneous objections to the challenged remarks" waives the issue on appeal. State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004); see Tenn. R. App. P. 36(a). Nevertheless, the Appellant requests that we review the issue for plain error. Tenn. R. App. P. 36(b); see State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015). We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

The Appellant first takes issue with the prosecutor's stating as follows during his rebuttal closing argument:

> The [defendant's] account that she gave you about an hour or so ago was not credible. That individual had got up on the witness stand and told you something that was untrue. You know that from just evaluating her testimony, what she said, whether or not it was reasonable. And you also know from that last point about being a reasonable statement, it was unreasonable. That she tried to sell you a story where she put her hands up and then the next thing she saw was Mr. Vaughn on the ground, she doesn't know how he got there. She doesn't know who did it. Who did what. That defies logic.
>
> . . . .

- 10 -

So who do you believe in this case? Who did tell you the truth? Along with your common sense and life experiences that we have discussed, Judge Dozier will read you a very important jury charge for you to consider. And that charge relates to credibility of witnesses. He's going to tell you that you all are the exclusive judges of the [credibility] of the witnesses. So this is a decision that you will be making.

He's going to tell you that, as you can see, all witnesses are presumed to testify truthfully. Well, obviously in this case, that presumption has been shaken because somebody did not tell you the truth. [Either] Robert Vaughn didn't tell you the truth or Maria Flowers didn't tell you the truth.

Robert Vaughn's demeanor, like I indicated, he was very matter of fact about what happened. She just kind of told you straight. What occurred, what he [did], what he didn't do. But he wasn't shaken by the cross examination of the defendants. His story stayed true. His account of what happened stayed true because it was true.

. . . .

Robert Vaughn told you the correct account. She is obviously hiding a lot of information. She obviously doesn't want to get herself in trouble, she obviously doesn't want to get her boyfriend in trouble, and she obviously doesn't want to get her brother in trouble. And the way that she does that is tell a fib and delete the actual main event that we are all here about.

The Appellant contends that the State impermissibly vouched for the victim's credibility and "called [the Appellant] a liar." We disagree. During closing arguments, counsel for Mofield repeatedly stated that the victim's claim of an unprovoked attack did not make sense. Defense counsel for the Appellant then argued as follows:

Mr. Vaughn wanted you to believe that he was just minding his business, hanging out and somebody just comes up randomly knocks over a beer that he had on the ground and pushes him, no reason at all. You bring your life experiences,

- 11 -

your background, everything you know about the world to that jury room with you. You decide of the witnesses you saw, who is more <u>credible</u>. Whose story was more <u>believable</u>.

Ms. Flowers is trying to protect herself. She told you that it's self-defense and she was trying to protect herself. She said she was trying to protect herself that night. She was trying to protect herself that night. She said that. She said that. She was trying to protect herself when somebody was threatening her with a bottle and coming towards her at a -- and grabbed her and put his hands on her when she knocked that bottle out of his hand. And she got up and she told you.

The State might say, you know, she didn't tell you what her brother and her boyfriend did. And we talked in jury selection about split-second decisions, things that happen fast. She told you, he grabbed her, she's trying to protect herself. The next thing she knows, he's on the ground. She knows her brother and her boyfriend were there. I'm not quite sure who did what, but she knows they helped. She's not trying to hide anything. She's also not trying to [add] anything or make up anything to help complete somebody else's story or narrative.

Counsel for the Appellant raised the issue of who was credible, the Appellant or the victim, and the State responded to that argument. Therefore, the prosecutor's statements were not improper.

Next, the Appellant claims that the prosecutor improperly vouched for the non-violent nature of the victim when the prosecutor knew that the victim had been arrested for a violent domestic assault within six months of trial and that the prosecutor improperly expressed his personal beliefs as to the evidence and guilt of the Appellant. Again, we disagree with the Appellant.

According to the Appellant's brief, the State was aware that the victim was accused of two acts of domestic violence in 2015 "in which it was alleged he drew blood." The brief then cites to an affidavit in the technical record. According to the affidavit, Dane McPeak told a police officer on November 11, 2015, that the victim punched him in the nose with a closed fist and "busted" his nose. The affidavit was not signed by the affiant, and the accompanying arrest warrant was not signed by a judge or

magistrate. At trial, counsel for the Appellant tried to question Pauline Spalding about the November 2015 domestic violence incident between McPeak and the victim. In a jury-out hearing, Spalding testified that all she knew about the incident was that "the police was called and they had an argument. . . . There was not charges. My understanding is there were no charges brought against anybody." Because no one was convicted of domestic assault, Spalding did not have to evict McPeak and the victim.

During his rebuttal closing argument, the prosecutor stated:

> If there was any need for 32-year old Ricky Palmer, 32 almost 200-pounds, give or take Ricky Palmer, 31-year old Scottie Mofield, 31-year old Maria Flowers who -- and I'm not saying this to be rude, but she could hold her own against the victim. Ya'll saw Robert Vaughn, the medical records are going to show that he was about 64-kilograms, which is about 141 pounds. That seems about right from what you saw. He is very, very skinny individual. He's 49 at the time this happened, 50-years old now.
>
> What would have been necessary to protect her? Possibly blowing on the man and he would have fallen over. I say that facetiously, but it wouldn't have taken a lot if they were actually protecting this lady from the vicious and uncontrollable Robert Vaughn. There is absolutely no way that what they did to him under any circumstances is legally acceptable in any way, shape or form.
>
> They caused -- they, all three of these defendants, caused this man devastating injuries.

The prosecutor was not commenting on the victim's "non-violent nature" and did not express his personal beliefs as to the evidence of the Appellant's guilt. Instead, he was commenting on the victim's age and size in comparison to that of the defendants, the excessive force used against the victim by the defendants, and the criminal responsibility of all three defendants for beating the victim. Therefore, the prosecutor's argument was not improper.

Finally, the Appellant takes issue with statements made by the prosecutor about photographs of the victim's injuries. During cross-examination of the victim by the Appellant, the victim testified that the police photographed his injuries, that Spalding had photographs of his injuries, and that "I believe there was pictures taken at Vanderbilt

also." Counsel for the Appellant requested a bench conference to inquire about the photographs. At the bench, the trial court asked the State if it had any photographs, and the State said no. Detective Cantrell later testified on cross-examination by counsel for the Appellant that he photographed the victim's injuries. The State introduced the victim's medical records into evidence but never introduced any photographs. At the motion for new trial hearing, the State advised the trial court that it was never able to locate any photographs and that it had advised counsel "about the situation" before trial.

During closing arguments, counsel for the Appellant argued as follows:

> People mentioned pictures. Mr. Vaughn said, hey, a bunch of people took pictures of me. Police took pictures of me he said. Pauline Spalding took pictures of me he said. The doctors took pictures of me he said. Has the State shown you anybody's pictures? Except the [pictures] of the defendants and 15 other people who were in a photo array with [them]? Did he show you Pauline Spalding's pictures? No.
>
> I believe it was Detective Lukas Cantrell who said he took pictures, where are those? If they corroborated Robert Vaughn's case, wouldn't you expect to see them? That they showed what he said, would you expect to see that?

On rebuttal, the prosecutor stated:

> The defense is focused on photographs. That is where the red herring comes into play that I discussed. Nobody is disputing -- none of these defendants have disputed this man's injuries. What you heard from several credible witnesses was disgusting as it related to the man's injuries. You heard Ms. Spalding talk about how she showed you how his eye was squirting. You heard officers talk about how weeks later he was still obviously disabled, obviously in very bad shape with regard to his face. You all did not need those photographs to make your decision.
>
> It's do you believe Ms. Spalding, the officers, the victim, the doctors, or do you not. The photos would be unnecessary and probably make you more irritated at the State for making you look at those.

- 14 -

According to the Appellant's brief, "[t]he State cannot have it both ways. Either the photographs exist and should have been turned over to the defense prior to trial as part of discovery or they do not exist and the State should not have [misled] the jury as to their existence and gruesome nature . . . ." However, the State told the Appellant during the victim's testimony, and apparently before trial, that it did not have any photographs. The Appellant then chose to raise the issue during her closing argument, implying that the State was withholding the photographs from the jury because they did not show the victim was seriously injured. Therefore, the prosecutor was simply responding to counsel's argument. Accordingly, the prosecutor's argument was not improper, and the Appellant is not entitled to relief, let alone plain error relief.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE